In the

# United States Court of Appeals

## For the Seventh Circuit

No. 10-1696

EFRAIN MORALES,

*Petitioner-Appellant*,

*v.*

YOLANDE JOHNSON,

*Respondent-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 00 C 2656—**Matthew F. Kennelly**, *Judge.*

ARGUED FEBRUARY 17, 2011—DECIDED SEPTEMBER 20, 2011

Before EASTERBROOK, *Chief Judge*, and RIPPLE and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* Efrain Morales was convicted by a jury in Illinois state court of one count of first-degree murder and two counts of attempted murder. His cumulative sentence was ninety years in prison. Morales filed two post-conviction petitions in Illinois state courts, but obtained no relief. He filed a federal habeas corpus petition pursuant to 28 U.S.C. § 2254,

claiming, *inter alia*, that he was deprived of his constitutional right to effective assistance of trial counsel and that the prosecution knowingly obtained his conviction on the basis of perjured testimony. The district court held an evidentiary hearing and denied the petition, but granted a certificate of appealability on these two claims. Morales appealed, and we affirm.

## I. Background[1]

### A. Facts

On the evening of October 24, 1994, Charles Crawford, Jose Nevarro, and Billy Bradford were gunned down as they worked on Bradford's car in front of his home at 710 North Willard Court, Chicago, Illinois. Bradford was killed. Crawford and Nevarro survived their injuries. Efrain Morales and Mario Gonzalez were charged in connection with the shooting.

On May 13, 1996, Gonzalez pled guilty to first-degree murder and two counts of attempted murder in exchange for a forty-four-year sentence. In doing so, he stipulated under oath to the following facts: On October 24, 1994, he and Morales, members of the Milwaukee Kings gang,

---

[1] We have provided a shortened version of the facts and procedural background of this case, attempting to limit our presentation to the more critical matters. A more complete rendition may be found in Judge Kennelly's thorough and well-written opinion, see *Morales v. McCann*, No. 00 C 2656, 2010 WL 748203 (N.D. Ill. Feb. 25, 2010).

agreed to shoot some members of the Satan Disciples, a rival gang. They got into Gonzalez's car (which was painted with gray primer) and drove to the area near North Willard Court. They approached 710 North Willard Court on foot, saw three people (Bradford, Crawford, and Nevarro) working on a car and began shooting at them. After that, Gonzalez and Morales returned to the gray primer car, drove down another street, and looked down Willard Court; Gonzalez saw that three people lay shot in the street.

Morales's jury trial commenced on May 15, 1996. The state's evidence included eyewitness testimony from Crawford and Nevarro, identifying Morales as the second shooter; testimony of Morales's friend, Katrina Scimone, that Morales told her he was involved in the shooting and asked her to say she was with him that night; and physical evidence which confirmed that two gunmen were involved in the shooting. The trial testimony revealed the following:

On the evening of October 24, 1994, Crawford and Nevarro were helping Bradford work on his car, which was located in front of Bradford's house at 710 North Willard Court. Crawford had moved from Chicago to Oklahoma in about 1981 and was in Chicago visiting his son, who lived across the street from Bradford. Nevarro was dating Bradford's daughter. At one point, Bradford and Nevarro went inside Bradford's house to get some tools. Crawford stayed outside and observed two cars, a white Chevy and a gray primer Chevy, each containing three or four people, driving on Willard Court. Crawford

recognized Gonzalez as the driver of the gray car and knew that he was a member of the Milwaukee Kings gang. As Gonzalez drove by, he "threw" a hostile gang sign at Crawford. Crawford recognized it because he was a former member of a rival gang, the Satan Disciples. Crawford had left that gang around 1981. Scared, Crawford hid in a nearby gangway until Bradford and Nevarro returned. He told them what had happened and the men continued working on the car.

Crawford testified that Nevarro yelled, "Look out," and Crawford looked up and saw Morales and Gonzalez walking across the street from the alley on the east side of Willard Court. Crawford knew them both; he had seen them several times before. He knew Gonzalez's name, but didn't know Morales's name. Both Gonzalez and Morales wore black "hoodies." Crawford looked straight at them and could see their faces. Gonzalez had a black automatic pistol, and Morales had a chrome revolver. Morales and Gonzalez started firing at Crawford, Bradford and Nevarro. Crawford was hit in the knee. Crawford saw the same white Chevy that had driven by earlier pull up and someone yelled, "Hurry up." Morales and Gonzalez stopped shooting and headed into the alley next to Bradford's house.

At approximately 10:45 p.m. that night, Dorothy Bradford heard gunshots coming from outside. She ran outside and saw that her husband was shot and lying on the ground. Bradford died from his injuries. As she held her dying husband, Dorothy saw a gray primer car being driven on nearby Huron Street. She had seen that same

car "around and around and around" her neighborhood for weeks before. Morales and Gonzalez were usually the drivers. Dorothy knew Morales as "Shotgun" and identified him at trial.

Officers quickly arrived on the scene. They questioned Crawford, seeking a description of the assailants. Crawford reported that there were two shooters, Hispanic males who wore black hoodies. But other than that, he "didn't tell them nothing." He did not tell the officers that he recognized Morales and Gonzalez as the shooters because he was afraid for his own safety. Crawford told the officers that his name was "Charles Vega," also because of concerns for his safety. He was taken to an area hospital where he stayed for a few days. Detectives visited him at the hospital and showed him a photo array. Crawford picked out Gonzalez's picture, identifying him as one of the shooters. Crawford said that Gonzalez was a Milwaukee King. Crawford did not tell the detectives that Morales was a shooter; Crawford explained at trial that he didn't know Morales's name. Crawford arranged to meet with the detectives after being discharged from the hospital, but he never did. Instead, he returned to Oklahoma because he was scared and didn't want to have anything to do with the investigation. A few days before trial, Crawford, who had returned to Chicago under subpoena to testify, identified Morales in a photographic array. He also identified Morales in court.

Nevarro testified that he had been a member of the Satan Disciples but quit three to four years before trial. He

had known Morales for at least nine years and knew he was a Milwaukee King nicknamed "Shotgun." Nevarro testified that after he and Bradford returned to the street from Bradford's house, Crawford was hiding in the gangway and looked like he had "seen a ghost." The three men started working on the car again and Nevarro heard a noise coming from the alley on the east side of Willard Court. He turned toward the alley and saw Morales and Gonzalez with guns. Nevarro also saw a third man who retreated back into the alley. Nevarro shouted, "Watch out," and Morales and Gonzalez began shooting. Nevarro testified that Morales was shooting a "big chrome revolver" and Gonzalez had a "black automatic." Nothing blocked Nevarro's view as the assailants came through the alley shooting, and a streetlight was right in front of Bradford's house. Nevarro testified that Morales and Gonzalez wore black hoodies. Nevarro was shot in the leg; Crawford and Bradford were also shot. Nevarro testified that right after the shooting, he looked toward Huron Street and saw a gray "jacked up kind of car" which he recognized as one he had seen in the neighborhood every day. He testified that it was often driven by Gonzalez, Morales, or another Milwaukee King Nevarro identified as "Adrian."

At the scene, Nevarro spoke to the officers very briefly, describing the gray, jacked-up car he had seen. He was uncooperative with the police, even attempting to walk away. He didn't give them either the names or descriptions of the shooters. Nevarro testified that he "wanted to take care of them [him]self," meaning that he was going to go back to his "street ways." He later realized

that the "best way to deal with it" was to let the police handle it. While Nevarro was being treated at the hospital, two detectives asked him to come down to the police station and view a line-up. He agreed. Once he arrived at the station and saw the line-up, which included Gonzalez, he knew that Gonzalez was in custody. At that point, he identified Gonzalez as one of the shooters. Right after that, Nevarro viewed a photo array and identified Morales as the other shooter.

Katrina, Morales's friend, testified at trial about her relationship with Morales and interaction with him between the date of the shooting and subsequent to his arrest on November 15, 1994. Katrina had lived in Chicago and was familiar with the Milwaukee Kings gang, including one of its members, Shotgun, whom she identified as Morales. She had been a member of the Milwaukee Queens for approximately one week three years before. In October 1994, Katrina was friendly with Morales and was living with her father in the suburbs. Katrina testified at trial that Morales was not with her at all on October 24, 1994.

Katrina further testified that the afternoon of October 28, Morales telephoned her and said, "Katrina, I need to talk to you. That I need your help. That they were shooting. The MKs [Milwaukee Kings] are at war with the SDs [Satan Disciples] and a man got shot." Morales said that the "MKs were shooting at the SDs," he was there and that he was involved when they were shooting. He said that he needed to talk to her and she needed to come over to his sister's house. Morales told

Katrina that the police were looking for him and had a warrant out for his arrest. Katrina testified that Morales asked her to say that she was with him on October 24 from 6:00 p.m. until 1:00 a.m. the next morning; that she and her father picked him up at 6:00 p.m., got to her house at 6:37 p.m., and then dropped him off at 1:00 a.m. He asked her to tell these things to the police if they came to talk to her. In addition, she testified that Morales asked her to say things to the police about their relationship—that she had been with him for one-and-a-half years, that she was his girlfriend, and they were engaged to be married, all of which she testified was untrue. Katrina also stated that Morales asked her to describe the way the rooms in her house were arranged and the color of the furniture for him, and she did so.

According to Katrina's testimony, on the evening of October 28, she went to Morales's sister's house with her father. She met with Morales, who essentially repeated what he told her earlier that day, and she agreed to help him. He stated that "I was shooting, me and the gang were shooting." She said he asked her to say that she was his girlfriend, his fiancée, or whatever and would marry him. He asked her to say he was at her house on the 24th from 6:30 or 7:00 p.m. until 1:00 a.m. in the morning, and that her dad picked him up and dropped him off. She stated that he went over the times that she was supposed to tell the police three times. At first she told him that she would help him, but was scared that she would be arrested or go to jail. Morales assured her that she wouldn't go to jail as long as she stuck to the story.

On November 15, 1994, an assistant state's attorney and detective came to Katrina's home. She spoke with them, advising that Morales wanted her to lie for him. She said that she did not lie to them, but told them what Morales had instructed her to say to the police.

Katrina testified that on November 19, Morales called her and said that he knew she did not tell the police what she said she was going to tell them, that is, what he told her to say. He called her a "bitch" and said he was mad because she didn't tell the police what she had agreed to say. Katrina stated that Morales seemed angry with her for not telling the police the lie that he had told her to say. He asked her to place a three-way telephone call to Ricky, the Chief of the Milwaukee Kings. She called Ricky's home. He wasn't there, so Morales spoke with Ricky's grandmother. Katrina heard Morales say that Ricky had to get in touch with the SDs [Satan Disciples] to tell Littleman, whom Katrina knew to be Nevarro, not to sign a statement or sign something against Morales. Katrina stated that Morales continued to telephone her several more times and was angry with her for not lying for him.

The physical evidence collected at the scene of the shooting tended to support the eyewitness testimony about the shooting. Officers discovered eight cartridge cases at the mouth of the alley south of 710 North Willard. They found two metal bullet fragments on the sidewalk in front of Bradford's house and two metal fragments on the street. The fragments indicated that two types of ammunition were used: one was soft lead,

likely from a revolver; the other was copper-jacketed, "usually from an automatic." A forensics investigator testified that based on this evidence, two different weapons were used in the shooting. An October 24 search of Gonzalez's apartment led to the recovery of a loaded .9-millimeter semiautomatic handgun; forensic testing established that the weapon had fired the discharged cartridge cases found at the mouth of the alley. The police did not recover any other weapon used in the shooting.

The jury found Morales guilty of first-degree murder and two counts of attempted murder. He was sentenced to a sixty-year prison term for murder, consecutive to two concurrent thirty-year terms on the attempted murder convictions.

## B. Post-Trial Proceedings

The Illinois appellate court affirmed on direct appeal. *See People v. Morales*, No. 1-96-2582, 718 N.E.2d 1088 (Ill. App. Ct. Nov. 5, 1997) (unpublished table disposition). Morales's petition for rehearing was denied. Morales did not appeal that decision.

On March 27, 1998, Morales filed a state petition for post-conviction relief, claiming his trial counsel was ineffective because he failed to properly impeach Katrina's testimony and failed to call Thomas Scimone, her father, as a witness. Morales supported his petition with affidavits from Katrina and Thomas. In her first affidavit, Katrina stated that she didn't know and didn't remember

whether she was with Morales on October 24, 1994 at the time of the shooting. She explained that when the police and state's attorney first came to her, she was scared and didn't know what to say, so she said "no" she wasn't with Morales, but in her mind, she "wasn't sure." She also said that Morales asked her to say that she was with him, but she told him that she could not remember. In her second affidavit, Katrina stated that prior to Morales's trial, his attorney, Robert Callahan, asked her if she was with Morales on the night of the shooting, and she said she didn't know.

Thomas's affidavit states that he was with Morales the evening of October 24. Thomas said he picked Morales up between 5:30 and 6:30 p.m. and stayed with him at Thomas's house in Elmwood Park until he dropped Morales off at 11:00 or 11:30 p.m. Although Thomas couldn't remember what car he was driving that evening, he said it was either a 1985 white Volkswagen Jetta or 1983 cream Toyota Corolla, both stick shifts. He stated that he contacted Morales that night "[t]o purchase cocaine" and once they arrived at his home, he purchased an "eight ball and cooked it up." Thomas also claimed that Morales called him the day after the shooting and wanted to get together because he was being accused of murder. Thomas said that he and Katrina met Morales the next evening, on October 26.

The trial court summarily denied the petition for post-conviction relief; the Illinois appellate court affirmed. *See People v. Morales*, No. 1-98-2749, 760 N.E.2d 1061 (Ill. App. Ct. Oct. 20, 1999) (unpublished table decision). The ap-

pellate court held that Katrina's testimony "was not critical to a finding of" guilt and that her "corroborating testimony did not so prejudice defendant that he was deprived of a fair trial." It also ruled that trial counsel did not act unreasonably in not calling Thomas as a witness, citing "an apparent strategic reason" for not doing so—Thomas said that at the time of the shooting he was purchasing cocaine from Morales and "cooking it up." Leave to appeal was denied. *People v. Morales*, No. 88702, 724 N.E.2d 1273 (Ill. Feb. 2, 2000) (unpublished table decision).

In 2001, Morales filed a successive post-conviction petition. The petition asserted that the state presented perjured testimony at trial. It also alleged ineffective assistance of counsel at trial, on direct appeal, and in post-conviction proceedings, and that newly discovered evidence established his innocence. In May 2001, the trial court dismissed the petition as frivolous and without merit. The state appellate court affirmed. *See People v. Morales*, 791 N.E.2d 1122 (Ill. App. Ct. 2003). The court first decided that Morales had abandoned all but two of his claims: ineffective assistance of appellate counsel and actual innocence based on newly discovered evidence. *Id.* at 1127-28. More specifically, Morales challenged appellate counsel's failure to investigate, interview, and call Katrina and Thomas to testify. *Id.* at 1129 & 1131. The court stated that appellate counsel did not act unreasonably in not pleading that trial counsel was ineffective for failing to interview the Scimones because "[t]rial counsel had no reason to believe in 1996 that Katrina would equivocate in 1998." *Id.* at 1131. As

for Thomas, the court concluded that Morales had not shown prejudice because there was "no ground for believing that, had trial counsel . . . presented [Thomas's] testimony about 'cooking up' cocaine with [Morales] on the night of the shooting, [Morales] would have been acquitted because of a credible alibi." *Id.* And the court was not persuaded by the claim of actual innocence, finding that the affidavits Morales offered to show his innocence contained inadmissible hearsay, were unpersuasive, did not contain new, material evidence as required, and were ultimately not credible. *Id.* at 1132. The Illinois Supreme Court denied leave to appeal. *People v. Morales*, No. 96569, 803 N.E.2d 494 (Ill. Oct. 7, 2003) (unpublished table decision).

Meanwhile, on May 1, 2000, Morales filed a petition for writ of habeas corpus in the federal district court. Counsel was appointed, and an amended petition was filed. The district court dismissed the amended petition without prejudice to allow Morales to exhaust his state court remedies. The matter was later reinstated and, on July 1, 2004, Morales filed a second amended habeas petition, alleging that trial counsel was ineffective in conducting his interview of Katrina, failing to impeach her with her statement that she did not recall whether she was with Morales at the time of the shooting, and in failing to investigate and call Thomas as a witness. The petition also claimed that Morales was convicted on the basis of perjured testimony by Katrina. (A third claim was raised but it is not at issue in this appeal.)

After determining that Morales alleged facts that if proven would entitle him to relief and that the state

court post-conviction proceedings denied him a full and fair hearing to develop a factual basis for his ineffective-ness claim, through no fault or lack of diligence by Mo-rales, the district court held an evidentiary hearing and made findings on the claim. *See* 28 U.S.C. § 2254(e)(2); *Price v. Thurmer*, 637 F.3d 831, 836-37 (7th Cir. 2011). At the evidentiary hearing, Thomas testified that on the night of the shooting, he picked up Morales "in my car," which he described as a white Volkswagen Jetta, stick-shift around 6:30 p.m. He said Katrina was with him. Although Thomas couldn't recall why he picked up Morales that night, he claimed it might have been to purchase co-caine. Thomas testified that Morales didn't leave the house until Thomas and Katrina drove him home in "my Volks-wagen," around 12:00 a.m. According to Thomas, Morales called him the day after the shooting and said there had been a murder and he was being accused of it. (Morales was not arrested until November 15, however.) Thomas claimed he picked up Morales that night. Thomas said that he never contacted the police but talked to Morales's attorney, advising him that Morales was with Thomas the night of the shooting. Thomas stated that the attorney said that he would contact Thomas if he was needed as a witness. Thomas also testified that he got a blue Pontiac 6000 four-door after he sold his white 1983 Volkswagen Jetta. (As noted, Thomas's affidavit referred to a 1985 Volkswagen Jetta and 1983 Toyota Corolla.)

Morales testified at the hearing that he was at the Scimones' house at the time of the shooting. He said

Thomas had called him because he wanted to purchase cocaine and that Thomas picked him up in Thomas's "own car"—a white, two-door, stick-shift around 6:00 or 6:30 p.m. Morales claimed that Katrina was with her father. According to Morales, once they arrived at the Scimones' house, he sold Thomas an "eight ball" and helped him "cook it up," meaning they turned it into crack cocaine. After that, Morales claimed, he spent the time hanging out with Katrina and getting high with Thomas until they took him home around 11:00 or 11:30 p.m. Morales said that he advised his trial attorney Callahan of his alibi and Callahan said he would investigate it.

Morales's hearing testimony was essentially consistent with his statements reflected in a police report made following his arrest. The November 17, 1994, report indicates that Morales was interviewed and stated that he was with his girlfriend, Trina Scimone, on the date of the incident; that she and her father picked him up at 7:00 p.m. and drove him to their home where he stayed until they took him home at 1:00 a.m. Morales claimed that Trina's father drove his older, white stick-shift vehicle. The report also states that when interviewed, among other things, Katrina said that her father drove a blue Pontiac 6000 four-door with an automatic transmission and that she has never seen him drive a white stick-shift car.

Katrina also testified at the evidentiary hearing. She initially stated that Morales did not call her and ask her to say that she was with him on the night of the murder.

However, she recalled testifying before the grand jury and at trial that she was not with Morales on the night of the murder and that he called her and tried to get her to say she was with him, which wasn't true. She offered the explanation that she was "so confused with everything," and "scared at the time." The district court summarized Katrina's trial testimony regarding Morales's October 28 phone call and then asked whether Morales had a conversation like that with her in which he said, "I was there at the time of the shooting, and I want you to tell the police that I was with you between 6:00 at night and 1:00 in the morning?" Katrina answered, "I don't know if he said that [he] was there. I don't remember everything." When asked if she and Morales ever had a conversation like the one about which she testified at trial in which he said he wanted her to tell the police that he was with her, Katrina said, "He probably—yes, he did." She added that it was "probably because we were together all the time." She testified that she could not remember whether Morales told her that he was there when the shooting occurred. Katrina said that when she had the phone conversation in which Morales asked her to say he was with her, she told him she didn't remember and did not say she would tell the police that he was with her. And later in her testimony, she stated that when Morales called her and asked her to say that she was with him, she told him she didn't remember if she was with him or not.

Katrina further testified that she told the police Morales called her and asked her to provide an alibi for him and

say she was with him on the date of the shooting. She stated that she told the police she was not with him. Katrina also stated that Morales asked her to tell the police that they were engaged to be married; she said that she was "seeing him" and her friend was "seeing him, too." When asked whether they were engaged to be married, Katrina offered, "Well, we were getting engaged," which meant that they had "talked about it."

Katrina stated that when she first spoke to police and an assistant state's attorney on November 15, 1994, she was scared. The police told her if she didn't tell the truth or if she lied for Morales, she would go to jail. She told them that she was not with Morales at the time of the shooting. She felt she had to give an answer of "yes" or "no," so she just said no. Katrina testified that the assistant state's attorney didn't tell her how to testify, that is, to answer "yes" or "no." She explained that she said "no" because she "wasn't sure." No one threatened her and no one indicated to her what her answer should be. At the hearing, Katrina could not remember if Morales told her that he was there when the shooting occurred, whether she was with him the night of the shooting, or whether he asked her to describe her house. Katrina said that Morales's attorney, Callahan, visited her more than once before trial and she told him she did not remember whether she was with Morales on the night of the shooting.

The district court denied the habeas petition. *Morales v. McCann*, No. 00 C 2656, 2010 WL 748203 (N.D. Ill. Feb. 25, 2010). The court found Katrina to be a "largely

credible witness." *Id.* at *23. It said that she credibly testified she told Callahan she was unsure whether she was with Morales at the time of the shooting. The court did not believe that Katrina gave knowingly false testimony at trial, however. It reasoned that it was likely she believed she had to give a definitive answer and "it was more probable that she had not been with [Morales] the night of the shooting." *Id.* The court found that neither the police nor prosecutors told Katrina what to say at trial, although they "pushed" her to give a definitive answer. *Id.* at *24. In the court's view, it was significant that Katrina never disavowed, either at the evidentiary hearing testimony or in her affidavits, her trial testimony that Morales asked her to provide an alibi and told her he was involved in the shooting, even though she no longer recalled the latter. *Id.*

The court did not regard Thomas as a "generally credible witness" and found that the alibi testimony he and Morales presented was not credible. *Id.* at *22-23. Significantly, Thomas testified that he owned, and was driving, a white, stick-shift Volkswagen Jetta on the night of the shooting, and Morales attempted to corroborate this point in his hearing testimony and his post-arrest police statement. But documentary evidence showed that no such vehicle was registered to Thomas or his mother (they shared registration of one vehicle) at that time. The fact that both witnesses testified to the same set of untrue facts suggested that the alibi was fabricated. *Id.* at *23. The court also relied on the fact that when interviewed by police, Katrina told them that her father drove a Pontiac, and Thomas testified

that he sold the Jetta to buy the Pontiac. *Id.* It further relied on the inconsistency between Thomas's testimony that he and Katrina went to Morales's home the day after the shooting and Katrina's trial testimony that they did not go see Morales until several days after the shooting. *Id.*

The district court also considered the testimony Morales offered to establish that he was not the second shooter. The court believed that Oswaldo Arroyo's testimony that Nevarro told him he had not seen the shooters' faces and that he falsely implicated Morales was inadmissible hearsay. The court declined to consider it under Fed. R. Evid. 804(b)(3) because Morales did not show that Nevarro was unavailable to testify. *Id.* at *12. The court found that Desire Aponte's testimony identifying Roberto Moncada (her cousin) as the second shooter was of "dubious credibility"—although Moncada supposedly confessed to Aponte in 1994 and she began corresponding with Morales a few years later, "neither she nor Morales came forward with Moncada's purported confession until after his death." *Id.* at *26. The court likewise found "unconvincing" Gonzalez's testimony that Moncada, not Morales, was the second shooter. Gonzalez's explanation for falsely implicating Morales at the time of his guilty plea was not persuasive. *Id.*

The district court found that Morales procedurally defaulted his claim that Katrina presented perjured testimony at trial and decided that this default was not excused based on his "actual innocence." *Id.* at *27-28.

Even if he could show "actual innocence," the court decided that the claim would fail because Morales had not shown, or even alleged, that the prosecution knowingly presented false testimony. *Id.* at \*28. Although the court found that Callahan's performance was deficient in several respects, it concluded that Morales was not prejudiced by Callahan's actions. *Id.* at \*30-37. It reasoned that "Morales stood little chance of success unless he was able to shed doubt on the eyewitness identifications and Katrina's testimony that he admitted being present at the shooting and importuned her to help him with an alibi," and he was unable to do that. *Id.* at \*36. That left the alibi testimony, which the court found was undermined by the documentary evidence of the vehicle registration. *Id.* at \*37. Furthermore, the court found that the impeachment value of Katrina's statement that she didn't know whether she was with Morales "would have been relatively insignificant" because she never said she was with Morales on the night of the shooting and testified that he asked her to support an alibi and admitted to her that he was at the shooting. *Id.* The district court entered judgment in favor of respondent and against Morales. The court issued a certificate of appealability on the claims of ineffective assistance relating to Katrina and Thomas and the perjured testimony. Morales appealed.

## II.  Analysis

Morales contends that his trial counsel was ineffective in investigating Katrina, in failing to impeach her state-

ment that she was not with Morales on the night of the shooting, and in failing to interview and call Thomas as an alibi witness. Morales also contends that he was convicted on the basis of Katrina's perjured testimony that she was not with him that night.

## A.  Standard of Review

We review the district court's decision to deny Morales's habeas petition de novo and review its factual findings for clear error. *Kerr v. Thurmer*, 639 F.3d 315, 318 (7th Cir. 2011), *petition for cert. filed*, 80 U.S.L.W. 3004 (U.S. June 23, 2011) (No. 10-1557). When a state court rules on the merits of a habeas claim, our review is limited by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). *See* 28 U.S.C. § 2254(d); *Harrington v. Richter*, 131 S. Ct. 770, 780 (2011). Under AEDPA, we may grant relief only if the state court's decision on the merits "was contrary to or an unreasonable application of clearly established Supreme Court precedent, or if it was based on an unreasonable determination of the facts in light of the evidence." *Kerr*, 639 F.3d at 318 (citing 28 U.S.C. § 2254(d)(1) & (2)). When "no state court has squarely addressed the merits" of a habeas claim, however, we review the claim under the pre-AEDPA standard of 28 U.S.C. § 2243, under which we " 'dispose of the matter as law and justice require.' " *Id.* at 326 (quoting § 2243). This is "a more generous standard," *George v. Smith*, 586 F.3d 479, 484 (7th Cir. 2009): "we review the petitioner's constitutional claim with deference to the state court, but ultimately

*de novo*," *Kerr*, 639 F.3d at 326 (citing *Harrington*, 131 S. Ct. at 788 ("Even under *de novo* review, the standard for judging counsel's representation is a most deferential one.")).

### B. *Strickland* Claim

We first address Morales's ineffective assistance of counsel claim. The clearly established Supreme Court precedent for ineffective assistance of counsel claims is set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). To establish ineffective assistance of counsel, Morales has to show both "that counsel's performance was deficient" and "that the deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687. The second prong requires a showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. This requires "a probability sufficient to undermine confidence in the outcome," *id.*, and means a "substantial, not just conceivable" likelihood of a different result, *Harrington*, 131 S. Ct. at 791-92. We need not address both prongs of the *Strickland* analysis. *See Strickland*, 466 U.S. at 697. "If it is easier to dispose of [the] claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Id.*; *see also Freeman v. Chandler*, 645 F.3d 863, 869-70 (7th Cir. 2011) (declining to address *Strickland*'s first prong where it was "legally murky and involved" and proceeding to the second prong). Prejudice is the only prong that we need to address in this appeal.

As the district court found, no state court had "assessed the combined prejudice resulting from Callahan's unreasonable performance vis-à-vis Katrina and Thomas Scimone." *Morales*, 2010 WL 748203, at *36. Because no state court "fully considered" the prejudice prong of the ineffective assistance claim, we apply the pre-AEDPA standard of review. *See Wiggins v. Smith*, 539 U.S. 510, 534 (2003) ("[O]ur review is not circumscribed by a state court conclusion with respect to prejudice, as neither of the state courts below reached this prong of the *Strickland* analysis."); *George*, 586 F.3d at 485 ("[W]e hesitate to apply a stricter standard of review without a clearer indication that Wisconsin fully considered [petitioner's] claim on the merits."). Regardless of the standard of review, this claim fails.

The district court correctly determined that Callahan's deficient performance with respect to Katrina and Thomas, even when considered in totality, did not cause Morales prejudice. Morales has not shown a reasonable probability that, but for Callahan's unprofessional errors, the result of the trial would have been different. The eyewitness testimony from victims Crawford and Nevarro was substantial evidence against Morales. To be sure, eyewitness testimony is not always reliable, *see, e.g.*, *Newsome v. McCabe*, 319 F.3d 301, 305 (7th Cir. 2003) ("Most persons have difficulty remembering or describing the features of strangers."); *Wright v. Gramley*, 125 F.3d 1038, 1043 n.4 (7th Cir. 1997) (citing cases noting that eyewitnesses often give unreliable testimony), and Crawford and Nevarro were not choir boys.

However, the factors weighing against their credibility were laid out at trial—e.g., their lack of initial cooperation with authorities, Nevarro's prior drug convictions (not surprising since he once was a gang member), and Crawford's failure to identify Morales until one-and-a-half years after the shooting. To claim that Crawford and Nevarro were members of a rival gang, as Morales does, overstates the record. Crawford left the gang around 1981; Nevarro left approximately two years before the shooting. Even though Nevarro initially planned to take the matter into his own hands (Morales had just killed his girlfriend's father), Nevarro ultimately decided to cooperate with authorities. Morales's letter to the trial judge (not an affidavit or sworn declaration) stating in conclusory fashion that Nevarro was behind several stabbings of Morales while the latter was incarcerated was not reliable. Morales fails to point to anything in the record to substantiate his claim that Nevarro "has long wanted Morales dead at any cost." While neither Crawford nor Nevarro identified Morales at the scene or initially cooperated with police, the record provides their reasons for doing so. *See Toliver v. Hulick*, 470 F.3d 1204, 1209 (7th Cir. 2006) (concluding that witness's testimony was not weak where his failure to cooperate with police initially was explained—"he was frightened"). Each of them eventually overcame his fear or desire for revenge and cooperated with authorities. In reply, Morales questions why Crawford's fear did not prevent him from "immediately" identifying Gonzalez as a gunman, but caused him to hesitate as to Morales. Crawford did not "immediately" identify Gonzalez.

More to the point, Crawford's trial testimony explains why: He didn't know Morales's name.

Morales argues that the district court erred in believing that the jury found Crawford's and Nevarro's testimony sufficient to convict him. He cites a few cases to support his claim of prejudice, but the eyewitness identifications in those cases were made in circumstances that rendered the testimony quite vulnerable to attack: the witnesses had only a "momentary glimpse" or brief viewing of the assailant(s), the lighting was dimmed, and/or the witnesses were unfamiliar with the assailant(s). *See Malone v. Walls*, 538 F.3d 744, 759, 760, 762 (7th Cir. 2008) (eyewitness was a current member of a rival gang, yet didn't immediately identify the defendant as the shooter or claim he was present; he first described the shooter as light-complected, but later identified the defendant, who was dark-complected, as the shooter; and the witness's contemporaneous utterances suggested that someone other than the defendant was the shooter); *U.S. ex rel. Hampton v. Leibach*, 347 F.3d 219, 250, 253 (7th Cir. 2003) (the case against the defendant "depended entirely on" the eyewitness identifications; none of the eyewitnesses knew the defendant or had more than a "momentary glimpse" of the assailant; the eyewitnesses were victims of a chaotic attack by a large group of people; the light was dimmed; and the witnesses did not provide a physical description of the assailant, but only later identified defendant in a line-up); *Wright*, 125 F.3d at 1042-43 (eyewitnesses to attack gave a radically different physical description of the assailant and one eyewitnesses saw assailant only briefly).

In contrast, Crawford and Nevarro had ample opportunity to observe Morales at the time of the shooting. They were familiar with him: Crawford had seen Morales on several other occasions, and Nevarro had known Morales for approximately nine years. *Cf. United States v. Bartlett*, 567 F.3d 901, 906 (7th Cir. 2009) ("The social-science studies [showing high error rates in the identification of strangers] do not suggest that people who have known one another for weeks or years are apt to err when identifying them in court."). Although the shooting was at night, a streetlight was directly above the men as they worked on Bradford's car, and the lighting in front of Bradford's house was described as "excellent." Nothing blocked either Crawford's or Nevarro's view. Crawford looked "straight at" Morales at the time of the shooting. Both Crawford and Nevarro gave consistent descriptions of the shooting, including what happened and what the shooters were wearing. And it bears emphasizing the obvious: The prosecutor presented eyewitness testimony from not just one, but two eyewitnesses. Each witness's identification of Morales as the shooter corroborated the other's testimony. *Cf. id.* at 907 (noting that the studies showing high error rates in eyewitness identifications concern "identification by *single* eyewitnesses, not the probability of error when multiple witnesses identify the same person.").

Furthermore, physical evidence supports their testimony that there were two shooters and their different descriptions of the type of weapons used. It is true that the physical evidence does not corroborate their identification of Morales as one of the shooters. But the cor-

roboration of other aspects of their testimony may be viewed as lending support to their overall credibility. And the state court's factual finding that "the physical evidence supported the eyewitness testimony" is entitled to deference. *See* 28 U.S.C. § 2254(e)(1); *Wiggins*, 539 U.S. at 530. Moreover, Dorothy Bradford's testimony lends some further support to their testimony that Morales was one of the shooters. She testified at trial that right after the shooting, she saw the same gray primer car driving on a nearby street that she had seen driving around the neighborhood "for weeks" and she identified Gonzales and Morales as the usual drivers. And there was no credible testimony identifying or describing the second shooter as someone other than Morales.

The two eyewitness identifications were substantial evidence against Morales and negated any possibility of *Strickland* prejudice from Callahan's errors respecting Katrina and Thomas. *See, e.g.*, *Allen v. Chandler*, 555 F.3d 596, 602 (7th Cir. 2009) (holding state court did not unreasonably apply *Strickland* in concluding that petitioner was not prejudiced by counsel's elicitation of his post-arrest silence where there was reliable and strong single-witness identification of defendant at trial—store clerk observed the robber at close range, identified him without hesitation in photo array and at trial, and identified him as a frequent store customer, and surveillance video corroborated her account of the robbery). The record reveals that Crawford and Nevarro had sufficient opportunity to view Morales and they were paying attention to him during the shooting. In addition, Morales

was no stranger to them; they knew him by name or sight. As Morales acknowledges, Callahan attempted to discredit Crawford's and Nevarro's testimony. And although their testimony was strong proof of Morales's guilt, it was not the only evidence.

Katrina testified that a few days after the shooting, Morales called her and asked her to help him out; he told her that they were shooting and a man got shot. She stated that Morales said that he was there and involved in the shooting. He told her the police were looking for him and had a warrant for his arrest. Morales wanted her to say that he was with her that night and told her what to say. He asked her to describe her house for him, which she did, and asked her to tell the police that they were engaged, which wasn't the truth. Katrina stated that she went to see Morales later that same day and he admitted that he and the gang were shooting and asked her to say he was with her at her house that night. He even went over the times she was supposed to repeat to the police three times and assured her that she wouldn't go to jail as long as she stuck to the story. Furthermore, Katrina testified that a few weeks later Morales called her, said he knew she did not tell the police what he asked her to say, called her a bitch, and was angry because she hadn't lied for him.

Morales argues that Katrina's testimony on collateral review undermines all incriminating testimony she provided at trial. Not so. The district court conducted an evidentiary hearing and had the opportunity to judge Katrina's credibility while testifying. The record does

not suggest that her trial testimony—other than whether she was with Morales that night—was anything but honest and accurate. Morales asserts that Katrina's hearing testimony shows she did not actually believe that the proffered alibi was false. Not true. She simply does not know whether the suggested alibi is false or not, and testified, credibly according to the district court, that she cannot recall whether Morales was with her on the night of the shooting. That Katrina no longer could recall at the evidentiary hearing whether Morales called her and said that he was there at the shooting and asked her to give him an alibi would not be likely to cause a reasonable person to doubt her trial testimony that he did so. More than twelve years had passed since the events in question took place. Morales argues that Katrina retained no memory of whether he actually confessed to her or whether this testimony was the product of fear. Yet, as the district court found, she "did not back off from her trial testimony" that Morales told her he was there when the shooting took place. And Katrina did not testify that her trial testimony regarding Morales's confession was because of fear or other pressure.

We reject Morales's argument that Katrina's uncertainty as to whether she was with Morales on the night of the shooting should have precluded her from credibly stating at trial that he confessed to her. The two are not mutually exclusive. Morales posits: "If [he] was with her, he was not committing the crime of which he stands convicted, and was therefore incapable of confessing to it." That would be true *if* he was with her. But Katrina

does not know whether Morales was with her. It does not follow from the fact that she cannot recall whether he was with her that he *was* with her that night. Katrina further testified that Morales probably called her and asked her to tell the police that he was with her. Additionally, Morales presses no real attack on her trial testimony that he called her from jail a few weeks after the shooting and was angry with her because she hadn't lied for him.

Morales maintains that Katrina's testimony about his alleged confession and efforts to get her to provide an alibi was the centerpiece of the prosecution's case. Her testimony was indeed important, and the prosecution emphasized its importance in its closing and rebuttal arguments. Nonetheless, Morales overstates its importance in light of the substantial eyewitness testimony of Crawford and Nevarro that identifies Morales as one of the shooters.

As for Morales's alibi, the district court held an evidentiary hearing, observed Morales's and Thomas's demeanors, and concluded that their alibi testimony was not credible. This determination is a factual finding to which we accord great deference and "must not be set aside unless clearly erroneous." Fed. R. Civ. P. 52(a)(6); *see also Williams v. Lemmon*, 557 F.3d 534, 540 (7th Cir. 2009) (stating that "a court of appeals respects a credibility finding unless the judge has taken a view inconsistent with the laws of physics or with uncontradicted documentary evidence"). The district court wrote that both Morales and Thomas "tied the alibi to the claim

that Thomas was driving a white Volkswagen Jetta at the time ([and] that is also what Morales had told the police after his arrest in 1994)." *Morales*, 2010 WL 748203, at *23. At the evidentiary hearing, Morales did not specifically refer to a Volkswagen Jetta, but did say Thomas drove a white, two-door, stick-shift, which was consistent with what he told police after his arrest. [SA73.] This description was consistent with Thomas's testimony that he drove a white, stick-shift Jetta. Yet the documentary evidence from the Illinois Secretary of State reflects that no Jetta was registered to Thomas (or his mother). A Pontiac was registered to him instead, which was consistent with Katrina's testimony. In addition, Thomas testified at the evidentiary hearing that he sold his Jetta to buy a Pontiac; records show that he obtained the Pontiac at the latest in January 1994, well before the October shooting. It seems that in his statement to police, Morales described Thomas's previous vehicle.

Morales argues that the district court's credibility determination hinged only on the fact that he and Thomas testified to the same, non-credible, minor detail of the alibi. It is not insignificant that Thomas repeatedly claimed that he drove Morales in "my" car, *see*, *e.g.*, ("I picked him up in my car. I had a little Volkswagen."), ("I drove him back in my Volkswagen")—not someone else's vehicle. Thomas should have known what car he had at the time of the shooting, even if Morales didn't.

Yet the fact that they testified to the same, non-credible detail was just one basis for the district court's credi-

bility finding. The court explained that its judgments re-
garding the credibility of testifying witnesses were "based
on their demeanor, . . . the reasonableness of their testi-
mony in light of the other evidence, any inconsistencies,
and other factors appropriately considered." *Morales*,
2010 WL 748203, at *21. In addition, the court wrote,
albeit specifically in reference to Thomas's story that he
talked to Morales's lawyer on the phone the day of trial,
that "having seen and heard Thomas testify, the Court
did not regard him as a generally credible witness." *Id.*
The court also said that it "did not find Thomas' testi-
mony [about going to Morales's home the day after the
shooting] credible." *Id.* at *23. It is reasonably clear that
the court did not find Thomas to be a credible witness
overall. Thus, its finding that the alibi testimony was not
credible was not based solely on the fact that Morales
and Thomas testified to a non-credible, minor detail of
the alibi. We owe a great amount of deference to the
district court's "opportunity to judge the witnesses'
credibility." Fed. R. Civ. P. 52(a)(6). Given the record
before us and the deference owed to the credibility
finding, Morales cannot show that the court clearly
erred in determining that the alibi testimony was not
credible.

In sum, Crawford and Nevarro provided direct evi-
dence of Morales's—a person known to them—guilt. The
wife of one of the victims also spotted the gray primer
painted car nearby, a vehicle with which Morales had
been associated. And his gang affiliation conformed with
the facts surrounding the shooting. Even if Katrina's
testimony that she was not with Morales on the night of

the shooting had been impeached by her statement that she could not recall if she was with him, the impeachment value was slight given the remainder of her trial testimony. Her lack of recollection as to whether she was with Morales that night did not discredit her testimony that he admitted to her that he was there and shooting and asked her to provide him an alibi. And the district court found that the alibi testimony offered by Morales and Thomas was not believable. Morales has not shown a reasonable probability that but for Callahan's errors as to Katrina and Thomas the result of his trial would have been different.

## C. Perjured Testimony Claim

Morales concedes that he procedurally defaulted his claim that he was convicted on the prosecution's knowing use of perjured testimony. He maintains, however, that his default should be excused to avoid a "fundamental miscarriage of justice." *See Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Coleman v. Hardy*, 628 F.3d 314, 318 (7th Cir. 2010). He argues that his default may be excused because of his claim of actual innocence. *Schlup v. Delo*, 513 U.S. 298, 314-15 (1995); *Hardy*, 628 F.3d at 318. To obtain relief, Morales "must show that 'in light of new evidence, it is more likely than not that no reasonable juror would find him guilty beyond a reasonable doubt.'" *Hardy*, 628 F.3d at 319 (quoting *House v. Bell*, 547 U.S. 518, 537 (2006)). This standard requires a stronger showing than that required to establish *Strickland* prejudice. *House*, 547 U.S. at 571 (Roberts, C.J., concurring in

part and dissenting in part); *Schlup*, 513 U.S. at 327-29. Morales "must support the innocence claim 'with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.'" *Hardy*, 628 F.3d at 319 (quoting *Schlup*, 513 U.S. at 324). We "consider all the evidence, old and new, and based on this total record, make a 'probabilistic determination about what reasonable, properly instructed jurors would do.'" *Id.* (quoting *House*, 547 U.S. at 538). We review de novo the district court's determination that Morales's procedural default should not be excused. *See Holmes v. Hardy*, 608 F.3d 963, 967 (7th Cir. 2010).

Morales first offers the alibi evidence from Thomas. The district court, having heard and seen Thomas testify, found that he was not a generally credible witness. The court specifically found that his alibi testimony was not credible, in part because he and Morales tied the alibi to the claim that Thomas was driving a white Volkswagen Jetta at the time, and their claim was undercut by the documentary evidence which showed no such vehicle registered to Thomas or his mother. Their claim was also undercut by Katrina's statements when interviewed by police after the shooting that Thomas drove a Pontiac. The district court reasoned: "The fact that both Morales and Thomas testified to the same, non-credible particulars of the alibi story tends to suggest that the alibi was fabricated." *Morales*, 2010 WL 748203, at *23. The district court further found that Thomas testified that he and Katrina went to Morales's home the day after the shooting, which was contrary to Katrina's trial testi-

mony. The district court did not find this testimony credible either.

Morales also offers evidence from Katrina that she did not recall in 1994 and cannot recall now whether she was with him on the night of the shooting. As the district court correctly observed, Katrina has never said that she was with Morales on the night of the shooting. Nor has she ever disavowed her trial testimony that he admitted to having been present at the shooting and asked her to provide an alibi for him.

Other evidence, from Melvin Boyd, Albert Guerra, Oswaldo Arroyo, Gonzalez, and Desire Aponte, is offered to suggest that Nevarro planned to frame Morales and that Robert Moncada was the second gunmen. But the district court found that the affidavits and testimony offered to establish these facts were not credible or convincing. *See, e.g.*, *Morales*, 2010 WL 748203, at *26 (characterizing Aponte's testimony naming Moncada as the second shooter as "of dubious credibility" and Gonzalez's testimony at the hearing identifying Moncada as the second shooter as "unconvincing"); *id.* at *27 ("The evidence that eyewitness Nevarro told others that he falsely implicated Morales all came from convicted felons and is thus of suspect credibility."); *id.* at *28 (concluding that Gonzalez's hearing testimony that Morales was not involved "lack[s] credibility" and the fact that the Moncada evidence "was never brought forward until after Moncada was known to be dead . . . makes its believability suspect"). It has been said that such "11th hour" affidavits produced with "no reasonable explana-

No. 10-1696

tion" for a long delay are suspect. *Herrera v. Collins*, 506 U.S. 390, 423 (1993) (O'Connor, J., concurring). Also, convicted felons have diminished credibility. *See, e.g.*, *Taylor v. United States*, 287 F.3d 658, 662 (7th Cir. 2002) (explaining that risks of testifying include certainty of impeachment with prior convictions). Furthermore, the evidence offered to establish that Moncada was the second shooter was inherently suspect, submitted only after it was known that Moncada was dead—even though at least some of the witnesses gained their alleged knowledge before he passed away. And the district court considered Gonzalez's testimony, finding it lacking in credibility, based, among other things, on his admission under oath at his guilty plea hearing that Morales was the second shooter. The district court was entitled to disbelieve Gonzalez's recantation in light of his earlier testimony. *See Mendiola v. Schomig*, 224 F.3d 589, 593 (7th Cir. 2000) ("Disbelief of recantations is sensible.").

The new evidence fails to outweigh the other evidence pointing to Morales's guilt. Two eyewitnesses, Crawford and Nevarro, identified Morales as one of the shooters. They knew Morales; they had sufficient opportunity to observe him; and they were paying attention to him. Morales tried to impeach their credibility, but he offered nothing to undercut their identifications. True, the district court relied on codefendant Gonzalez's testimony at his plea hearing identifying Morales as his accomplice, and such testimony should be considered with care. But Gonzalez's statements are corroborated by Nevarro's eyewitness testimony and other credible evi-

dence. Morales has not offered any statement from Nevarro recanting his trial testimony. Nor has Morales demonstrated that in light of the new evidence it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt. He therefore has not satisfied the gateway standard. *See House*, 547 U.S. at 538; *Schlup*, 513 U.S. at 327.

But even if Morales's evidence allowed him to pass through the gateway, his claim that the prosecution knowingly offered perjured testimony from Katrina would fail. A conviction obtained through the knowing use of false testimony violates due process. *Napue v. Illinois*, 360 U.S. 264, 269 (1959). To obtain a new trial, a petitioner must establish that: (1) there was false testimony; (2) the prosecution knew or should have known it was false; and (3) there is a likelihood that the false testimony affected the judgment of the jury. *United States v. Freeman*, No. 09-4043, 2011 WL 2417091, at *3 (7th Cir. June 17, 2011). Morales cannot sustain his burden.

At the evidentiary hearing, Katrina testified that she could not recall at that time or at the time of the trial whether she was with Morales on the night of the shooting. Morales argues that the prosecution must have been aware that Katrina's fear caused her to testify contrary to her actual knowledge. He points to her testimony that at her first meeting with authorities, "some woman detective was yelling and telling" her that she could go to jail if she lied for Morales and that the authorities searched the whole apartment. This scared Katrina, who was just out of high school. Morales suggests

that Katrina understood the statement to her together with the search of her apartment "to require that she resolve doubts in her memory in favor of cooperating with the state." It is true that she could go to jail if she lied for Morales. But Katrina further testified that the assistant state's attorney did not tell her how to testify (didn't tell her to say "yes" or "no") and never told her to lie. Katrina stated that the assistant state's attorney simply told her she had to answer the question "yes" or "no," and no one threatened her or made any statement to her that she "considered intimidating about how [she] should testify." Morales suggests that the state should have known that its investigative tactics would result in Katrina giving testimony less favorable to him than she otherwise might. But there is no evidence in the record to support this assertion. He has not shown that the prosecution had any reason to believe that Katrina was not telling the truth when she said and later testified that she was not with him on the night of the shooting.

While Katrina's trial testimony that she was not with Morales was important, Morales ignores her other damaging testimony: After the murder, he called her and asked her to say she was with him; explained what happened—"we were shooting"—and that he was there and involved; and asked her to describe her new house in the suburbs, presumably so he could credibly describe it to the authorities if asked. She stated that Morales later repeated that he was there and shooting and repeatedly asked her to provide an alibi. She said that after his arrest, he contacted her several times, ex-

pressing his anger with her for not saying what he wanted her to say and not lying for him. Morales also ignores the substantial eyewitness testimony identifying him as the shooter. He has not shown a likelihood that Katrina's testimony that she was not with him at the time of the shooting, even if false, affected the jury's judgment.

### III. Conclusion

The determination that Morales was not prejudiced by his counsel's deficient performance at trial was not an unreasonable application of *Strickland*, and Morales has not shown that the prosecution knowingly used false testimony at trial. Nor has he shown that such testimony could have affected the jury's verdict. We therefore AFFIRM the district court's judgment.