In the

# United States Court of Appeals

### For the Seventh Circuit

No. 08-3537

MAURICE COLEMAN,

*Petitioner-Appellant,*

*v.*

MARCUS HARDY, Warden,*

*Respondent-Appellee.*

————————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:99-cv-02635—**Amy J. St. Eve,** *Judge.*

————————

ARGUED NOVEMBER 30, 2009—DECIDED NOVEMBER 19, 2010

————————

Before KANNE, ROVNER, and WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* In 1983, Maurice Coleman was convicted of the murder and armed robbery of Terrell Jackson. The sole evidence in the trial against him was the eyewitness testimony of Jackson's brother and stepdaughter, who were present in the home on the day of the murder. Coleman sought habeas corpus

* We substitute Marcus Hardy, the current warden of Stateville Correctional Center, as the Respondent in this action. *See* Fed. R. App. P. 43(c)(2).

relief from his sentence, claiming that he was deprived of his Sixth Amendment right to effective assistance of counsel. He also requested an evidentiary hearing to allow the court to make factual findings and credibility determinations regarding his claims of actual innocence and ineffective assistance of counsel. The district court denied Coleman's habeas petition and his request for an evidentiary hearing. Because we cannot meaningfully review Coleman's habeas petition without more information regarding the content of potential witnesses' testimony, we remand to the district court for an evidentiary hearing as to his claim of actual innocence.

## I. BACKGROUND[1]

### A. The Crime and Investigation

On August 2, 1981, Chicago police were called to a house

---

[1] While this appeal was pending and before we heard oral argument, the district court granted the government's motion to supplement the appellate record with Coleman's pro se petition for a writ of habeas corpus filed in 2006. Coleman responded with a motion to strike in this court, arguing that the supplemental pleadings have never been previously reviewed. Although we generally decline to supplement the record on appeal, *Ruvalcaba v. Chandler*, 416 F.3d 555, 562 n.2 (7th Cir. 2005), we do so when the supplemental material would provide helpful context, *Crockett v. Hulick*, 542 F.3d 1183, 1188 n.3 (7th Cir. 2008). The added context is particularly helpful here, when we are analyzing whether Coleman can show "actual innocence." The motion to strike is denied and the record is supplemented with Coleman's 2006 pro se petition.

in response to a report of a homicide. The victim, Terrell Jackson, was found in a second floor bedroom with multiple gunshot wounds. Arlander Adamson, Jackson's brother, and Gwen Thomas, Jackson's stepdaughter, both claimed to have witnessed the crime. According to the police report and Adamson's testimony at trial, Adamson had been watching television on the first floor when two men entered the house from behind with guns pointed at him. They forced Adamson to lie down and then tied his hands behind his back and gagged him. The men then forced Adamson up the stairs to the bedroom where Jackson was sleeping. They forced Adamson to lie down on the floor face down, next to his sleeping brother. Jackson woke up as the men slapped him and shouted "where's the money, where's it at?" and then shot him multiple times.

One of the men then went to the room where Thomas was watching television with her week-old baby. She was led to Jackson's room, where the men forced her to help them look for the money. The room was ransacked but no money was found. One gold chain with a round medallion bearing the initials "T.J." in diamonds and a ring also bearing the initials "T.J." in diamonds were allegedly taken in the invasion. The men then allegedly tied up Thomas and left. Adamson and Thomas untied each other and called the police. Adamson and Thomas gave a general description of the perpetrators to the police. The first man was described as a black male, 25-30 years old, 5 feet 10 inches to 6 feet tall, 140-150 pounds, black hair, light complexion, a possible small mustache, and wearing a blue track suit jacket with white stripes on the arms and blue jeans. The second man was described as a black male, 23-26

years old, 5 feet 4 inches to 5 feet 6 inches tall, medium build, black hair, dark brown skin, mustache and beard wearing a dark baseball-type cap and blue jeans.

Thomas called her cousin, Dorothy Davis, after the incident. Davis was on her way to Jackson's house when she was stopped by two men in a blue car. They asked if she was going to Jackson's, she denied she was, and they continued on their way. She gave a description of the males similar to that given by Adamson and Thomas.

Police also interviewed witnesses David and Tracey Wilkins, who lived next door to Jackson. At the time of the incident, David said he saw two black males sitting on the rear porch of Jackson's home. The two males left and returned several times during the one-and-a-half-hour period before the victim was shot. One male ran across to the laundromat and then returned. David's brother, Tracey, had been at the laundromat across the street, where he saw a black male come into the laundromat and use the phone. Approximately 45 minutes later, he saw two males running in the street (he assumed they were running because of the rain). The police report states that both brothers gave descriptions of the males similar to those given by Adamson and Thomas.

Several weeks later, on August 19, 1981, Thomas and Adamson separately picked Coleman out of a police lineup. David Wilkins also viewed the lineup but did not identify Coleman or anyone else as the perpetrator. At a police interview that day, Coleman told police he was not sure what he was doing on the day of the murder but that he was probably at his girlfriend's house or home alone. He denied any involvement in the murder.

During the investigation, police talked to a man named Roy Wright two different times. In the first interview, on August 3, 1981, Wright gave the police the following information: he was coordinating a drug deal with Jackson; he had picked up two men (one man he knew as "Rip" and later identified as Coleman, and one man he said he did not know at all) on the night of the murder; while in his car these strangers discussed a past event where they had killed someone; and he dropped them off in front of Jackson's house. During the second interview, on August 18, 1981, Wright also told the police that a few days after the murder, Coleman tried to sell him Jackson's medallion. Wright identified Coleman in a book of photographs.

Before a September 3, 1981 evidentiary hearing, Adamson picked out Joseph Barnes from a photo array and indicated that he thought Barnes might be one of the perpetrators. Barnes was living in Baltimore, Maryland at the time, and was extradited to Chicago. Adamson and Thomas separately identified Barnes as one of the perpetrators in a lineup.

## B. The Trial

Coleman and Barnes were tried together, with each represented by separate counsel. The sole evidence against Coleman at trial was Adamson's and Thomas's eyewitness testimony. There was no forensic evidence introduced at trial that tied Coleman to the crime. Coleman called three witnesses in his defense. Dorothy Davis testified about the two black males who had stopped her on her way to Jackson's house. She testified that neither man was Coleman nor Barnes.

Coleman also called two police officers to testify to impeach Thomas's trial testimony. Thomas testified at trial that a chain was pulled off her neck on the day of the murder while she was in her room. Two police officers testified that Thomas did not report a theft on the day of the crime, and that her bedroom was not searched or dusted for fingerprints.

During the trial, Coleman's counsel, Geary Kull, asked for a severance. When asked for reasons why he needed a severance, he asked to speak with the judge ex parte or in camera. The judge refused, and Kull did not publicly state his reasons for desiring a severance because he did not wish to disclose his evidence to the state's attorney. Kull renewed his motion for severance just prior to trial, but the trial judge again refused to have proceedings without the state's attorney present. Kull then asked to "preserve the record" for appeal, by putting a statement of his need for a severance under seal. The judge did not read this statement and denied the motion for a severance.

Co-defendant Barnes advanced an alibi defense by having a woman testify that she was with him at the time of the crime. This defense was disbelieved when the state presented evidence of his past lies during an extradition hearing. Both Barnes and Coleman were convicted by a jury of murder and armed robbery.

## C.  The New Evidence Discovered Post-Conviction

During Coleman's state post-conviction proceedings, co-defendant Barnes submitted an affidavit stating that

Coleman had nothing to do with the murder. Barnes stated his co-defendant should have been Roy Wright, and that Jackson was a drug dealer and the murder was a result of a drug deal gone wrong. Through the affidavit, and at an evidentiary hearing, Barnes testified to a detailed sequence of events leading up to the murder. Barnes's trial attorney, James Rhodes, signed an affidavit stating that Barnes had told him, during the trial, that Coleman had nothing to do with the murder. He also said that after the verdict, Barnes expressed dismay that Coleman had been convicted.

An investigator for the defense interviewed Adamson. Adamson admitted that Jackson was a drug dealer, that Wright had been to Jackson's home a couple of times on the day of the murder, and that Wright and Thomas had an intimate relationship. Adamson also acknowledged that the robbers were looking for $10,000 in drug money.

Loretta Cade, Coleman's girlfriend and the mother of his child, signed a statement that Coleman was with her at the time of the shooting. She also claimed that she gave this information to Coleman's trial attorney and advised him that she was willing to testify at the time of trial. Evelynn Cade, Loretta's mother, signed a statement that she called Loretta and Coleman on the day of the shooting at approximately 5:00 or 5:15 p.m. and spoke to Coleman for fifteen minutes. She stated that she specifically remembered the day because it was August 2, and her birthday was August 3. She also stated that she told this to Coleman's attorney at the time and that she had been willing to testify. Evelyn's statement was made in 1999, two days before the order of the state court on Coleman's post-conviction

motion asserting innocence. Loretta gave her statement in 2000, a year and a half later.

Coleman challenged his conviction on direct appeal, and filed a state post-conviction petition. The Illinois Appellate Court affirmed his conviction on July 31, 1998, and the Illinois Supreme Court denied leave to appeal on December 2, 1998. In April 1999, Coleman filed a habeas corpus petition under 28 U.S.C. § 2254, challenging the validity of his convictions for murder and armed robbery. The district court denied the petition on August 28, 2008, and we granted a certificate of appealability on the question of his procedural default and ineffective assistance of counsel claims.

## II. ANALYSIS

Coleman did not raise an ineffective assistance of counsel claim on direct appeal or on post-conviction review of his conviction. For this reason, unless an exception to the procedural default rule applies, Coleman's ineffective assistance claim is procedurally defaulted. *Lewis v. Sternes*, 390 F.3d 1019, 1026 (7th Cir. 2004). A procedural default can be avoided if a petitioner can show cause and prejudice or a fundamental miscarriage of justice. *Holmes v. Hardy*, 608 F.3d 963, 967 (7th Cir. 2010). Coleman argues that we can reach the merits of his ineffective assistance of counsel claim because a fundamental miscarriage of justice occurred, as he says he is innocent of the crime. *See Schlup v. Delo*, 513 U.S. 298, 315 (1995). He requested an evidentiary hearing to develop his actual innocence and ineffective assistance of counsel claims, but the district court denied

his request. We review the district court's denial of a habeas petitioner's request for an evidentiary hearing for an abuse of discretion. *Schriro v. Landrigan*, 550 U.S. 465, 468-69 (2007).

Coleman's effort to overcome his default is based on a procedural claim of innocence, and he does not bring a substantive claim of innocence. *Schlup*, 513 U.S. at 314. This means that his constitutional claim is based not on his innocence, but rather on his contention that the ineffectiveness of his counsel "denied him the full panoply of protections afforded to criminal defendants by the Constitution." *Id.* His assertion of innocence does not by itself provide a basis for relief. Instead, "his claim for relief depends critically on the validity" of his ineffective assistance of counsel claim. *Id.* at 315 (petitioner's claim of innocence is "not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits.") (internal quotation omitted).

A prisoner asserting innocence as a gateway to a defaulted claim must show that "in light of new evidence, it is more likely than not that no reasonable juror would find him guilty beyond a reasonable doubt." *House v. Bell*, 547 U.S. 518, 537 (2006) (internal quotation and citation omitted); *Holmes*, 608 F.3d at 968. This standard is "fundamentally different", and lower, than that for a substantive innocence claim because the procedural claim of innocence is accompanied with an assertion of constitutional error at trial. *Schlup*, 513 U.S. at 315-16. The petitioner must support the innocence claim "with new reliable evidence—whether

it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.*" *Id.* at 324. The reviewing court must consider all the evidence, old and new, and based on this total record, make a "probabilistic determination about what reasonable, properly instructed jurors would do." *House*, 547 U.S. at 538 (citing *Schlup*, 513 U.S. at 329). In making a probabilistic determination, it "must be presumed" that jurors obey the instructions of the court, including the instruction requiring proof beyond a reasonable doubt. *Schlup*, 513 U.S. at 329.

Although a claim of actual innocence is "rarely successful," *Schlup*, 513 U.S. at 324, an absolute certainty about a petitioner's guilt or innocence is not required to satisfy the petitioner's burden at the gateway stage. *House*, 547 U.S. at 538. And the proper inquiry is not whether a particular juror would have the power to convict in light of the old and new evidence, but rather "how reasonable jurors would react to the overall, newly supplemented record." *Id*. The actual innocence inquiry may also involve credibility assessments and a consideration of the strength of the government's case. *Id.* at 539-41.

The district court denied Coleman's request for an evidentiary hearing because it felt it had "the ability to make credibility determinations and no new factual findings are necessary to determine Coleman's ineffective assistance of counsel claims." Because Coleman did not pursue his ineffective assistance of counsel claim in his state post-conviction appeal, the federal court's ability to hold an evidentiary hearing is circumscribed. *Boyko v.*

*Parke*, 259 F.3d 781, 789 (7th Cir. 2001). In such a case an evidentiary hearing is warranted only if "the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." 28 U.S.C. § 2254(e)(2)(B). It follows that a hearing should be granted if it could enable a habeas applicant to prove his petition's factual allegations, which, if true, would entitle him to federal habeas relief. *Schriro*, 550 U.S. at 474. Here, development of the new evidence presented in Coleman's case, reviewed in concert with the total information available, could support his claim of procedural actual innocence. An evidentiary hearing is warranted to allow the district court a chance to evaluate the totality of this evidence.

The two pieces of new evidence here are the affidavits of Joseph Barnes (Coleman's co-defendant at trial) and James Rhodes (Barnes's trial attorney). In Barnes's affidavit, Barnes asserts that his co-defendant should have been Roy Wright, and that the murder was related to a bad drug deal. According to Barnes, he had not met Terrell Jackson before the evening of Jackson's murder because the drug deal had been set up using Wright and a man named Barnett Hall as middlemen. Barnes stated that he had expected drugs that could be "re-cut" several times as a way of increasing his profit, but when he received Jackson's drugs, he was disappointed by their lack of quality. He stated that he wanted either a better product or his money back, and so he told Wright to get in touch with Jackson. Wright could not reach Jackson and wanted more time to try to talk to him, but eventually Wright and

Barnes went to Jackson's house, where the murder occurred. In Barnes's testimony at the 1985 state post-conviction hearing, most of this version of events had been the same, but there is one significant difference. At the post-conviction hearing, Barnes testified that Barnett Hall came into Jackson's house during the night of the murder as well, and that Hall got shot in the ensuing fight. There is no corroborating evidence of a third offender being present, and Hall did not testify to any of these events as he died before the 1985 hearing.

We recognize that Barnes's reputation for honesty is weak. During an extradition hearing prior to trial, Barnes lied about living in Baltimore at the time of the murder. And, during the trial, he presented a false alibi defense. In addition, Barnes claimed in his own post-conviction hearing that Rhodes provided ineffective assistance of counsel by preventing Barnes from testifying, which Barnes later admitted was not true. In attempting to discredit Barnes's version of events, the government also places emphasis on the unknown extent of friendship between Barnes and Coleman. They claim to merely know each other from the neighborhood but were members of warring gangs that did not fight "on sight" (as the opposing gangs were supposedly instructed to do), and Barnes placed Coleman on a list of acceptable visitors when he spent time in jail in the 1980s. The weight of these inconsistencies led the state court to deem Barnes's testimony incredible and lacking in reliability.

Of course, as a general matter, at its evidentiary hearing the district court should accord a presumption of correct-

ness to the state court's credibility determination. 28 U.S.C. § 2254(e)(1); *Araujo v. Chandler*, 435 F.3d 678, 682 (7th Cir. 2005). But this "deference does not imply abandonment or abdication of judicial review." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). The court can disagree with the state court's credibility determination and conclude that the decision was unreasonable. *Ward v. Sternes*, 334 F.3d 696, 704 (7th Cir. 2003). Here, the court can consider the fact that Barnes's statements proclaiming Coleman's innocence were made to his attorney, a disinterested third party, at a time where there was no rationale or motive for dishonesty. It can also consider the significant fact that Barnes's contention to Rhodes that Coleman was not involved in the crime has remained consistent since the time of trial, but that Rhodes was prevented by the attorney-client privilege from revealing that information until Barnes waived the privilege. An evidentiary hearing would allow the district court to evaluate the reliability of Barnes's statements together with the additional evidence developed at the hearing.

And an evidentiary hearing would also allow further consideration of Adamson's account and possible ulterior explanations for the crime. First, Adamson admitted to police officers and to a private investigator that Jackson was involved with drugs. Adamson also stated to the private investigator that the robbers were looking for $10,000 in drug dealing money, that Wright had been to Jackson's home a couple of times on the day of the murder, and that Wright and Thomas, Jackson's step-daughter, were intimately involved. The jurors heard no testimony about Jackson's involvement with drugs or

drug dealing, and they were not given a motive for the crime. Second, Wright gave two odd, contemporaneous statements to the police that support his involvement. Wright claimed that on the night of the murder, he picked up an acquaintance known as "Rip" (whom he later identified as Coleman) and a man he did not know. Even though Wright did not know Rip well or the other man at all, Wright claimed that the two men discussed a previous murder they had committed. Wright stated that he shared, with these two acquaintances, the details of a drug deal that he was attempting to set up for that night. Wright continued to say that he saw the men hang out by the laundromat. Wright also stated that he approached Jackson's door several times that night. A few days after the murder, according to Wright, Coleman approached him to sell him a medallion that Wright knew belonged to Jackson. Wright's statement dovetails with Barnes's statements in key ways—both say there was a drug deal in progress, both claim a third person set up the deal with Jackson, and both agree the drug deal was going badly. Wright was also the first person to target Coleman as a possible suspect, and he was not called by the state as a witness.

Wright's involvement would also shed light on another odd aspect of the crime. All the bedrooms in Jackson's home were on the same floor. Although Gwen Thomas was in a bedroom down the hall from Jackson's, she claimed not to have heard the shouting or the gunshots or know that anything was amiss until a man came into her room and dragged her to Jackson's room. She alternatively testified that this was because she was watching television or sleeping. According to Adamson, Thomas and Wright

had an intimate relationship, and this might give her a reason to protect Wright. Thomas did not report to the police that anything had been stolen from her person until the preliminary hearing and trial, when she claimed a necklace had been ripped from her neck. Given the existence of a possible bias, jurors may not have credited Thomas's version of the events.

An evidentiary hearing would also allow evaluation of Coleman's alibi witnesses. The affidavits of Loretta and Evelyn Cade state that both are able to provide Coleman with an alibi for the time of the murder. Evelyn stated that Loretta and Coleman were watching her house while she was on vacation during this time, and that she called home on the day of the shooting around 5:00 or 5:15 in the afternoon and spoke to Coleman. She stated that she remembers the date and time exactly because it was August 2, and her birthday was the next day. Loretta stated that Coleman was with her at her mother's house at the time of the shooting. Loretta is the mother of Coleman's child and Evelyn is the child's grandmother, so they may have a motive to lie for Coleman. *Cf. House*, 547 U.S. at 552 (stating that testimony from those with no motive to lie has "more probative value than, for example, incriminating testimony from inmates, suspects, or friends or relations of the accused"). But when evaluating the likely impact of these affidavits, it is important that they are not a sudden and "eleventh-hour affidavit vouching for a defendant." *Id.* (citing *Herrera v. Collins*, 506 U.S. 390, 423 (1993) (O'Connor, J., concurring)). Both Cades stated that they told Coleman's attorney of their willingness to provide an alibi defense, and both were listed as potential defense witnesses at trial.

And the affidavits are also corroborated by Coleman's contemporaneous statements. During his police interview, where Coleman also denied any involvement in the crime or owning a gun, he stated that he was a loner who could not remember his exact whereabouts at the time of the murder but was probably home alone or at his girlfriend's house.

The total record evidence also includes the statements by the Wilkins brothers, but without an evidentiary hearing it is impossible to know exactly what their testimony would be. *See Davis v. Lambert*, 388 F.3d 1052, 1059 (7th Cir. 2004) ("The district court could not assess what impact the exculpatory eyewitnesses likely would have had upon the petitioner's trial without hearing their testimony.") (internal quotation and punctuation omitted). David and Tracey Wilkins were brothers who lived in a nearby house and saw a series of events leading up to the shooting. According to detectives, David stated that he observed two men sitting on the rear porch of Jackson's home, and that these men left and returned several times during the one-and-a-half-hour period prior to the shooting. Tracey stated that he was in the laundromat across the street when he saw a black male who matched the general description of the suspects come into the laundromat and use the telephone. Tracey stated he later saw two males erratically running down the street and changing directions as they ran, which he did not think was unusual because it was raining at the time. The police report did not contain the brothers' exact descriptions of the men they saw, but instead noted that the description was similar to the descriptions previously given. David viewed a police line-up and did not identify

Coleman at the lineup or at any point after the crime. And, in a joint letter written by Rhodes and Kull, the two defense lawyers stated that David Wilkins could affirmatively state that Coleman was not one of the two men David saw at the scene but that Barnes definitely was. An evidentiary hearing would allow an evaluation of whether and to what extent the Wilkinses are able to exculpate Coleman.

Finally, an evidentiary hearing would allow Coleman's attorney the opportunity to explain his strategy considerations in not calling the Cades or the Wilkinses, and in not verbalizing why his client needed a severance. *See Brown v. Sternes*, 304 F.3d 677, 691-92 (7th Cir. 2002) (noting importance of analyzing potential strategy decisions in evaluating counsel's performance); *Matheney v. Anderson*, 253 F.3d 1025, 1040 (7th Cir. 2001) ("An adequate record is imperative to properly evaluate ineffective assistance claims."). These are all critical factors in evaluating Coleman's claim of innocence and, if that threshold is met, his ineffective assistance claim. *See Schlup*, 513 U.S. at 314-15; *Strickland v. Washington*, 466 U.S. 668, 688-94 (both deficient performance and prejudice are required to establish ineffective assistance claims).

Here, an evidentiary hearing is warranted if the facts underlying Coleman's claim could establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found him guilty. 28 U.S.C. § 2254(e)(2)(B). The new evidence of Barnes's and Rhodes's affidavits, combined with the available testimony of the Wilkinses, the Cades, and Adamson, fulfill this

standard. An evidentiary hearing is warranted to develop this evidence.

## III.  CONCLUSION

We REMAND to the district court for an evidentiary hearing as to Coleman's procedural actual innocence claim and for further proceedings consistent with this opinion.