**131 Nev., Advance Opinion 96**
IN THE SUPREME COURT OF THE STATE OF NEVADA

| | |
|---|---|
| DEMARLO ANTWIN BERRY, Appellant, vs. THE STATE OF NEVADA, Respondent. | No. 66474 **FILED** DEC 2 4 2015 TRACIE K. LINDEMAN CLERK OF SUPREME COURT BY S. Young DEPUTY CLERK |

Appeal from a district court order dismissing a postconviction petition for writ of habeas corpus. Eighth Judicial District Court, Clark County; Michael Villani, Judge.

*Reversed and remanded.*

Weil & Drage, APC, and John T. Wendland, Henderson; Richards Brandt Miller Nelson and Lynn S. Davies, Craig C. Coburn, Joel K. Kittrell, and Steven H. Bergman, Salt Lake City, Utah, for Appellant.

Adam Paul Laxalt, Attorney General, Carson City; Steven B. Wolfson, District Attorney, and Christopher F. Burton, Deputy District Attorney, Clark County, for Respondent.

BEFORE SAITTA, GIBBONS and PICKERING, JJ.

## OPINION

By the Court, PICKERING, J.:

Demarlo Berry appeals from an order dismissing his third postconviction petition for a writ of habeas corpus. The district court dismissed Berry's petition as procedurally barred, without allowing discovery or conducting an evidentiary hearing. Berry supported his

petition with declarations under penalty of perjury that, if true, may establish a gateway claim of actual innocence. We conclude that the district court improperly discounted the declarations offered in support of Berry's petition, which were sufficient in form and content to merit discovery and an evidentiary hearing on Berry's gateway actual innocence claim. We therefore reverse and remand.

I.

A.

Shortly after 8 p.m. on April 24, 1994, Charles Burkes was murdered in the course of a robbery at the Carl's Jr. fast-food restaurant in Las Vegas where Burkes worked as a manager. On that night, an African-American male entered the Carl's Jr., went behind the front counter, and pulled a gun on the cashier, Rae Metz, demanding that she open the cash registers. As Metz started to comply, the robber passed behind her and she escaped out a side door. Outside, Metz encountered another Carl's Jr. employee, who was on a cigarette break. The two ran to a nearby bar, the Long Branch Saloon, to call 9-1-1. They then left the bar, followed by several bar patrons. The group saw a man come out of the Carl's Jr., who brandished a gun at them, jumped the low wall separating the Carl's Jr. parking lot from the Blue Angel Motel parking lot next door, and got into a waiting black Cadillac, which drove off.

Burkes was found lying face-down near the rear of the Carl's Jr. He died from a single gunshot wound through the back of his left shoulder. Two shots were heard by an employee who had gone into the restroom to hide while the crime was in progress. Burkes's autopsy recovered a single .357 or .38 caliber projectile. A second projectile, matching that recovered during the autopsy, was found on the floor near the safe.

In April of 1994, when the murder occurred, appellant Demarlo Berry was 18 years old, weighed 140 to 145 pounds, and was 5'8" or 5'9" tall. Six of the eyewitnesses the police interviewed immediately after the crime—including Metz who had the best, although most terrifying look at him—described the man they believed to be the perpetrator as between 5'10" and 6' tall and weighing 175 to 200 pounds. Another eyewitness, who had had approximately 12 beers that night, described the man he saw run away as 5'6" tall.

The police received phone calls providing information about possible culprits, and eventually Berry became a suspect. The police created a photographic lineup that included a picture of Berry and showed it to Metz and three other eyewitnesses. Metz positively identified Berry; the others were less committal but stated that his picture resembled that of the perpetrator. Their certainty grew over time, and by trial, each identified Berry as the perpetrator, as did a fifth eyewitness.

The police had difficulty locating Berry, who before the crime had been a regular customer at the Carl's Jr. and was often seen hanging out by the Long Branch Saloon. When they found Berry, he was uncooperative. Berry was arrested and at some point briefly shared a holding cell with a number of other arrestees, including a man named Richard Iden. Iden had been arrested in Ohio, where he was attending to his critically ill father, and brought back to Nevada to face bad-check charges dating back to 1990. Iden testified for the State at Berry's trial, stating that, while the two were in the holding cell together, Berry confessed to him that he had committed the robbery/murder at the Carl's Jr.

Iden had been employed by the Sheriff's Office in Knox County, Ohio, before becoming addicted to crack cocaine and resorting to theft and crimes of deception to finance his habit. He was cross-examined extensively at trial about his criminal history and the timing and details of the plea deal he received, by which he was given probation despite his numerous convictions. Iden was also examined about the inconsistencies in his accounts of Berry's confession—first, he told police that Berry told him that he and two others robbed "this guy," possibly at a restaurant, and killed him when he failed to cooperate; in a second statement, Iden said Berry told him that he and two others murdered the "assistant manager" while robbing "the Carl's Jr. on the corner of Eastern and Freemont Street," as another person stayed outside, and he alleged that Berry said he was facing Burkes when he shot him; finally, at trial, Iden could not recall if Berry stated the crime occurred at a restaurant. These details conflict with the eyewitness testimony, which reported two perpetrators—the gunman and the getaway driver—and the physical facts, which establish that Burkes was shot in the shoulder from the back, not facing his assailant.

Berry testified in his own defense at trial. He denied any involvement in the crime, except as a witness. Specifically, Berry testified that he and a friend, Larry Walker, had been walking up and down Fremont Street that night selling drugs. They separated near the Blue Angel Motel, so Berry could go to the Carl's Jr. to get something to eat. As he neared the front door of the restaurant, he saw a man behind the counter who was not wearing a Carl's Jr. uniform, and a scared-looking female employee, presumably Metz. Berry stayed outside to watch. The man and the woman left his view, and then he saw the man come out and

run away. Berry recognized the man as Steven "Sindog" Jackson, the leader of the San Bernardino Crips gang. Berry left the scene without giving a statement to the police and rejoined Walker. The pair watched the police activity from a distance and, roughly 40 minutes to an hour after the shooting, were approached by a K-9 officer who patted them down and asked if they knew what had happened. When Berry responded that they did not, the officer told them to go home.

Berry denied confessing to Iden and disputed Iden's repeated assertions that he and Berry knew each other from 1990, when Iden testified he was in Las Vegas and bought drugs from Berry. Berry explained that he did not volunteer information about Jackson to the police, or cooperate with them initially, because he feared retaliation against him and his family by the Crips. Berry called a San Bernardino police officer at trial who testified that Jackson was the leader of the San Bernardino "Tre 57" Crips, and dangerous.

Jackson's name also was reported to the police in the phone calls and tips they received after the crime. Like Berry, Jackson is African-American. At the time of the crime, he stood 6'0" and weighed 235 pounds. The police created a separate photographic lineup that included a picture of Jackson—his picture was not in the photographic lineup that included Berry's picture—but they did not show the lineup with Jackson's picture to the eyewitnesses they showed Berry's photographic lineup to. The police explained that their information suggested Jackson was the getaway driver, not the gunman, and that they could not find the eyewitness who could have placed Jackson as the driver of the getaway car. Marriage license records confirmed that Jackson was in Las Vegas to get married several weeks before the crime occurred.

The police never found the murder weapon. They collected 32 latent fingerprints and palm prints from the crime scene, none of which were a match for Berry's. On the second to last day of trial, the State presented a witness who had been asked during trial to attempt to compare Jackson's prints to those collected at the crime scene. While the comparison did not produce a match, this result was inconclusive because the examiner was working from fax copies and there was confusion over whether the set used for comparison purposes belonged to Jackson or Jackson's brother, "D-Dog," also a Crip.

## B.

Berry was charged with burglary, robbery, and first-degree murder, with the use of a deadly weapon, and the State filed a notice of intent to seek the death penalty. After the guilt phase of the trial, the jury deadlocked 11-1. They did not report whether the 11-person majority favored conviction or acquittal. The State agreed to withdraw its notice of intent to seek the death penalty if Berry would stipulate to waive his right to a unanimous jury verdict as to guilt. He did, and the jury returned an 11-1 verdict finding him guilty of all charges. A penalty phase followed as to whether Berry should receive life with, or life without, the possibility of parole, on which the jury again deadlocked. The district judge discharged the jury. Berry waived his right to have a three-judge panel decide his sentence on the murder charge in exchange for the State agreeing not to seek life without the possibility of parole. Berry was sentenced to 10 years on the burglary count, 15 years on the robbery count, and life with the possibility of parole for first-degree murder, the robbery and life sentences carrying equal and consecutive terms for the deadly weapon enhancement, and all running consecutively to each other.

Berry timely filed a notice of appeal. This court affirmed his conviction, *Berry v. State*, Docket No. 27585 (Order Dismissing Appeal, June 17, 1997), and the remittitur issued on February 9, 1998. There followed a timely postconviction petition for a writ of habeas corpus, in which Berry asserted his trial counsel had been ineffective in counseling him to stipulate to a non-unanimous verdict. The petition was denied, and the denial was affirmed on appeal to this court. *Berry v. State*, Docket No. 35201 (Order of Affirmance, April 6, 2001). Acting pro se, Berry filed a second postconviction petition for a writ of habeas corpus on September 17, 2008, asserting that he received a flawed jury instruction on the elements of first-degree murder under *Kazalyn v. State*, 108 Nev. 67, 825 P.2d 578 (1992), a decision from which this court retreated in *Byford v. State*, 116 Nev. 215, 235, 994 P.2d 700, 713-14 (2000). The petition was denied, and this court again affirmed. *Berry v. State*, Docket No. 52905 (Order of Affirmance, September 23, 2009).

## C.

In 2005, an investigator working on Berry's behalf contacted Steven "Sindog" Jackson in prison in California, attempting unsuccessfully to secure a confession from him. In 2011, Berry contacted the Rocky Mountain Innocence Center (RMIC), which in 2012 agreed to take his case. On May 2, 2014, Berry filed his third postconviction petition for a writ of habeas corpus, alleging newly discovered evidence and asserting the following nine claims: (1) the new evidence, considered with the trial evidence, demonstrates that Berry is actually innocent; (2) the State elicited and failed to correct perjured testimony from Richard Iden, in violation of *Napue v. Illinois*, 360 U.S. 264 (1959), and also failed to disclose transcripts of meetings with him at which he was coached, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963); (3) the police engaged

SUPREME COURT
OF
NEVADA

(O) 1947A

7

in misconduct by not adequately investigating Jackson; (4) the State's misconduct as set forth in claims 2 and 3 rendered Berry's trial fundamentally unfair, in violation of his due process rights; (5) judicial error in giving the *Kazalyn* instruction; (6) that the judge who presided over Berry's trial had a conflict of interest in that he also sentenced Iden, precluding a fair trial; (7) the non-unanimous verdict was unconstitutional; (8) ineffective assistance of counsel in mishandling the issues described in claims 6 and 7; and (9) cumulative error.

Chief among the evidence Berry offered to support his petition were four declarations. The first was from Jackson. In his declaration, Jackson confesses to the crimes and states: "I committed the robbery that resulted in the murder of Charles Burkes. DeMarlo Berry did not commit this crime, nor did he have any involvement in the commission of this crime." The Jackson declaration runs three handwritten, single-spaced pages and describes the crime in fair detail, including what he was wearing, his directions to Burkes to open the safe, Burkes's fumbling with the locks on the safe, and his fear that Burkes was stalling for time for help to arrive, whereupon, after directing Burkes to "hurry up," he shot him.

The second declaration was from Richard Iden. In his declaration, Iden recants his trial testimony about Berry's jailhouse confession and states, among other things, that "I testified falsely . . . at Demarlo Berry's murder trial in 1995 . . . Demarlo Berry never confessed to me. All of the details of my testimony were given to me by Detective Good, her partner, D.A. Booker, and/or the D.A.'s investigator." After addressing the details of his plea bargain, the Iden declaration discloses that, "[i]n addition, the State paid my airfare to return to Ohio and back to

Las Vegas twice. They also paid a per diem and hotel/meals during the course of the trial." Iden ends his declaration by admitting, as Berry has maintained throughout, that his testimony that Berry and he first met in 1990 when Iden bought drugs from Berry in Las Vegas was false: "I had never met Demarlo Berry prior to my brief conversation with him in [the] holding [cell]."

The third declaration came from Elizabeth Fasse, the RMIC lawyer who conducted the interview of Jackson that produced his confession. The Fasse declaration describes the Jackson interview in detail, and narrates that, after stating that he "had become a Jehovah's witness and 'wanted to get this off his chest and clear his conscience' . . . Mr. Jackson then proceeded to describe the facts and events leading up to and including the Crimes in significant detail and his direct involvement therein, interrupted only by occasional clarifying questions," adding that "[a]t no time during Mr. Jackson's narrative did we relay any information to Mr. Jackson about the Crimes."

The fourth declaration came from a woman named Maisha Mack, who attests that she "was acquaintances with Steven Jackson (aka 'Sindog') in 1993-1994." The Mack declaration reports that, "shortly after the murder . . . on April 24, 1994," she was with Sindog and his brother in the "Sierra Vista area of Las Vegas" when "Mr. Jackson confessed to me that he, with the help of his brother, committed the murder . . . . Specifically, Mr. Jackson said he was the one who shot the victim, Charles Burke[s], which killed him."

The district court dismissed Berry's petition on motion, without allowing discovery or conducting an evidentiary hearing.[1] It determined that the declarations in which Jackson confessed and Iden recanted his testimony that Berry confessed were "belied by the record." Addressing the Jackson declaration, the district court stated that it was "troubled by the number of omissions and their significance to the narrative," citing as examples the omission of any reference to Metz, whom the robber first encountered, or the black Cadillac, in which he fled. Of note, the district court's written decision does not acknowledge or address the Fasse declaration, which recited some of the details Jackson brought up during their interview, including the presence of two other Carl's Jr. employees in the restaurant besides Burkes (Metz and the employee who hid in the bathroom) and the fact that Jackson refused to name the getaway driver, which may explain the lack of reference to the black Cadillac. The district court also questioned whether Jackson could have shot Burkes by the safe, when trial photographs showed Burkes's body was found some distance away with no blood trail leading back to the safe.

[1]The district court resolved this case by written "decision" rather than a document entitled "findings of fact and conclusions of law." *But see* NRS 34.830 ("Any order that finally disposes of a petition, whether or not an evidentiary hearing was held, must contain specific findings of fact and conclusions of law supporting the decision of the court."). After this appeal was filed, the State obtained an expanded ruling from the district court entitled "findings of fact and conclusions of law." Berry appealed, and the appeal was dismissed on the State's agreement that the findings should be stricken from the record. *Berry v. State*, Docket No. 66877 (Order Dismissing Appeal, March 20, 2015).

Addressing the Iden declaration, the district court found the plea deal and Iden's "tenuous credibility" to have been thoroughly explored at trial, quoting Iden's trial testimony "that he would do or say anything to get money for his next high." As noted, the district court also deemed the Iden declaration, like the Jackson declaration, "belied by the record," and further dismissed both the Iden declaration and the Mack declaration as containing nothing more than "naked allegations." The decision concludes:

> The Petition for Writ of Habeas Corpus fails to set forth any newly discovered evidence of actual innocence that is not belied by the record. Because the evidence of actual innocence fails, the Petition's procedurally barred by NRS 34.726 and NRS 34.810. Moreover, Petitioner fails to overcome the prejudice to the State pursuant to NRS 34.800. Therefore, this Court DENIES Mr. Berry's Petition without an evidentiary hearing and GRANTS the State's Motion to Dismiss.

## II.

### A.

Berry filed the petition underlying this appeal on May 2, 2014, more than 15 years after this court's February 9, 1998, issuance of remittitur from his direct appeal. Therefore, Berry's petition is untimely. *See* NRS 34.726(1). As this is Berry's third petition, it is successive. *See* NRS 34.810(2). Also, since the State affirmatively pleaded laches, Berry must overcome the presumption of prejudice to the State. *See* NRS 34.800(2).

A habeas petitioner may overcome these bars and secure review of the merits of defaulted claims by showing that the failure to consider the petition on its merits would amount to a fundamental

miscarriage of justice. *See Schlup v. Delo*, 513 U.S. 298, 314-15 (1995); *Mitchell v. State*, 122 Nev. 1269, 1274, 149 P.3d 33, 36 (2006); *Pellegrini v. State*, 117 Nev. 860, 887, 34 P.3d 519, 537 (2001). This standard is met when the "petitioner makes a colorable showing he is actually innocent of the crime." *Pellegrini*, 117 Nev. at 887, 34 P.3d at 537. This means that "the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Schlup*, 513 U.S. at 327. "[A] petition supported by a convincing *Schlup* gateway showing 'raises[s] sufficient doubt about [the petitioner's] guilt to undermine confidence in the result of the trial without the assurance that that was untainted by constitutional error'; hence, 'a review of the merits of the constitutional claims' is justified." *House v. Bell*, 547 U.S. 518, 537 (2006) (quoting *Schlup*, 513 U.S. at 317).[2]

Here, Berry requests an evidentiary hearing on whether he is actually innocent so that he may pass through the *Schlup* gateway and

---

[2]Schlup's gateway claim of actual innocence was "not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Schlup*, 513 U.S. at 315 (internal quotations omitted). Nevada's postconviction habeas statute permits a petitioner to challenge a conviction that was obtained in violation of the United States or Nevada Constitutions or state law. NRS 34.724. Our case law does not resolve whether a state habeas petitioner, who passes through the *Schlup* actual innocence gateway, may have his procedurally defaulted *non-constitutional* claims heard on the merits, as well as defaulted *constitutional* claims. The parties suggest but do not adequately brief this issue, resolution of which is unnecessary given the reversal and remand here.

have his procedurally defaulted claims heard on the merits.[3] This court "has long recognized a petitioner's right to a postconviction evidentiary hearing when the petitioner asserts claims supported by specific factual allegations not belied by the record that, if true, would entitle him to relief." *Mann v. State*, 118 Nev. 351, 354, 46 P.3d 1228, 1230 (2002).

We see no reason to depart from the *Mann* standard in determining whether Berry is entitled to an evidentiary hearing on the gateway issue of actual innocence. We have not limited the use of the *Mann* standard to the grounds for relief in a habeas corpus petition. For instance, we have used this standard in deciding whether a petitioner may receive an evidentiary hearing to establish good cause to overcome the procedural bar in NRS 34.726(1). *See Hathaway v. State*, 119 Nev. 248, 255, 71 P.3d 503, 508 (2003) (reversing and remanding for an evidentiary hearing on the petitioner's good cause allegations because he had "raised a claim supported by specific facts not belied by the record, which if true, would entitle him to relief").

Further, federal circuit courts similarly hold that an evidentiary hearing regarding actual innocence is required where the new evidence, "if credited," would show that it is more likely than not that no reasonable jury would find the petitioner guilty beyond a reasonable doubt. *See Coleman v. Hardy*, 628 F.3d 314, 319-20 (7th Cir. 2010)

---

[3]Berry's petition suggests that he is making a free-standing actual innocence claim, in addition to a gateway actual innocence claim. This court has yet to address whether and, if so, when a free-standing actual innocence claim exists. *See also McQuiggin v. Perkins*, 569 U.S. ___, ___, 133 S. Ct. 1924, 1931 (2013) (stating that the Supreme Court also has not "resolved whether a prisoner may be entitled to habeas relief based on a freestanding claim of actual innocence"); note 2, *supra*.

(holding that within the context of 28 U.S.C. § 2254(e)(2)(B) an evidentiary hearing "should be granted if it could enable a habeas applicant to prove his petition's factual allegations, which, if true, would entitle him to federal habeas relief"); *Jaramillo v. Stewart*, 340 F.3d 877, 883 (9th Cir. 2003) (remanding for an evidentiary hearing to resolve whether the evidence proffered to show actual innocence was credible because that "evidence if credible, and considered in light of all the evidence, demonstrate[d] that it [was] more likely than not that no reasonable juror would have convicted [the petitioner] of the charged offenses"); *Amrine v. Bowersox*, 128 F.3d 1222, 1229 (8th Cir. 1997) (providing petitioner made a sufficient showing to require an evidentiary hearing on his actual innocence allegation because, "if credited, his evidence could establish actual innocence").

## B.

Applying this standard means that Berry would be entitled to an evidentiary hearing on his gateway actual innocence claim if he has presented specific factual allegations that, if true, and not belied by the record, would show that it is more likely than not that no reasonable juror would have convicted him beyond a reasonable doubt given the new evidence. This requires the district court to evaluate whether the new evidence presents specific facts that are not belied by the record and then, if so, to evaluate whether the new evidence, considered in light of all the evidence at trial, would support a conclusion that the petitioner has met the actual-innocence test—the caveat being that the district court must assume the new evidence is true when determining whether to conduct an evidentiary hearing.

Above, we provided a recitation of the facts to emphasize that this is a highly factual inquiry, even at the stage of determining whether

SUPREME COURT
OF
NEVADA

(O) 1947A

14

the petitioner should be granted an evidentiary hearing on his actual innocence claim. *See Schlup*, 513 U.S. at 301-13 (setting forth, in great detail, the facts supporting the petitioner's requested relief). The district court "must make its determination concerning the petitioner's innocence in light of all the evidence." *Id.* at 328. It must review both the reliability of the new evidence and its materiality to the conviction being challenged, which in turn requires an examination of the quality of the evidence that produced the original conviction. *See House*, 547 U.S. at 538 (*"Schlup* makes plain that the habeas court must consider all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial. Based on this total record, the court must make a probabilistic determination about what reasonable, properly instructed jurors would do." (internal quotations omitted)); *Schlup*, 513 U.S. at 331-32 ("[T]he District Court must assess the probative force of the newly presented evidence in connection with the evidence of guilt adduced at trial."). Still, the "court's function is not to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors." *House*, 547 U.S. at 538. Since the jury did not hear the new evidence, the district court should "assess how reasonable jurors would react to the overall, newly supplemented record." *Id.*

Unlike in summary judgment proceedings, the district court may make some credibility determinations based on the new evidence in determining whether to conduct an evidentiary hearing. *See Schlup*, 513 U.S. at 332 ("[T]he court may consider how . . . the likely credibility of the affiants bear on the probable reliability of that evidence."). For instance,

an affidavit from a death row inmate confessing to a defendant's crime may have less probative force than an affidavit from a disinterested witness who claims to have seen the inmate commit the crime. *See House,* 547 U.S. at 552 (recognizing that the claim of two eyewitnesses, with no motive to lie, that the husband spontaneously confessed to murdering his wife after the defendant was convicted had more probative value than "incriminating testimony from [fellow] inmates, suspects, or friends or relations of the accused"). Though a district court would be required to assume that the death row inmate's confession was true, it still must determine how reasonable jurors would react to the overall record. Thus, if there was strong evidence at trial linking the defendant to the crime, such as DNA or video evidence, a reasonable jury may convict the defendant, even in light of the inmate's confession, because the strength of the other evidence may still lead a reasonable jury to convict the defendant beyond a reasonable doubt.

Finally, it bears emphasizing that the actual-innocence "standard is demanding and permits review only in the extraordinary case." *Id.* at 538 (internal quotations omitted). Confidence in the petitioner's trial "must be 'undermined' before he is entitled to a hearing 'for the purpose of developing the evidence needed to pass his procedurally defaulted habeas claims through the actual innocence gateway.'" *Sibley v. Culliver,* 377 F.3d 1196, 1206 (11th Cir. 2004) (quoting *Davis v. Gammon,* 27 F. App'x 715, 717 (8th Cir. 2001)).

## C.

With these principles in mind, we turn to the district court's denial of Berry's request for an evidentiary hearing, which we review for an abuse of discretion. *See Rubio v. State,* 124 Nev. 1032, 1047, 194 P.3d 1224, 1234 (2008). The district court need not hold an evidentiary hearing

where a claim or allegation is repelled or belied by the record, or "necessarily false." *Mann*, 118 Nev. at 354-55, 46 P.3d at 1230. But a claim "is not 'belied by the record' just because a factual dispute is created by the pleadings or affidavits filed during the postconviction proceedings. A claim is 'belied' when it is contradicted or proven to be false by the record as it existed at the time the claim was made." *Id.* at 354, 46 P.3d 1230.

The district court determined that Jackson's declaration was belied by the record, in part, because the declaration made no mention of the assailant's initial contact with the Carl's Jr. cashier, Metz, and the fact that, after the robbery and murder, the assailant fled in a waiting black Cadillac. These omissions do not render the averments in the Jackson declaration "belied by the record" because the declaration does not affirm or deny the encounter with Metz or his departure in the Cadillac; the declaration is merely silent on both points. Jackson does aver that after leaving the restaurant he jumped over the brick wall and fled. This leaves open the possibility that Jackson fled in the Cadillac. Had he said he fled on foot, or by motorcycle, it would be more problematic. Additionally, the Fasse declaration, which the district court did not acknowledge, arguably explains the Jackson declaration's failure to mention the Cadillac—Jackson's insistence that he not implicate anyone else involved in the crime, here, the getaway driver, which the Mack declaration suggests was Jackson's brother. A declaration cannot be expected to contain every detail of a crime that occurred more than 20 years ago and, as noted above, Jackson's declaration, on the whole, was fairly detailed. The omissions may be fodder for cross-examination at an evidentiary hearing

but they do not render the Jackson declaration's averments "belied by the record."

The district court was also troubled that Jackson's declaration stated that he shot the victim near the safe, while crime scene photographs and trial testimony established that Burkes died in the back of the restaurant, away from the safe, with no blood trail showing that the victim moved or was moved. But, again, the Jackson declaration is not necessarily false in light of the record because the victim did not have an exit wound and the crime scene photos show a bullet casing by the safe, which supports Jackson's statement that he fired his gun from that area (two shots were fired, not one). Thus, Jackson's affidavit creates one or more factual disputes: whether the victim could have moved without creating a blood trail, and whether the assailant could have shot him from the area by the safe as the victim fled to the back of the restaurant.[4] The district court abused its discretion by resolving this dispute with its finding that the lack of a trail of blood necessarily means that the victim could not have been shot as the Jackson declaration describes. *See Vaillancourt v. Warden*, 90 Nev. 431, 432, 529 P.2d 204, 205 (1974) ("Where . . . something more than a naked allegation has been asserted, it is error to resolve the apparent factual dispute without granting the accused an evidentiary hearing.").

We do not discount the district court's concern with allowing one inmate's confession to exonerate another inmate, years after the crime. But in this case, exploring these issues at an evidentiary hearing is

---

[4]The district court observed that there was "blood around the victim's shoulder, on his hand, and coming from his mouth."

more appropriate than rejecting the evidence of actual innocence out of hand. The Jackson declaration provides specific details about the crime that were corroborated by other witnesses, such as one customer entering and leaving the restaurant as soon as he realized something was amiss, Jackson demanding that the manager open up the safe, and Jackson running away from a crowd and jumping over a wall between the Carl's Jr. and the Blue Angel Motel. Though Jackson is currently imprisoned on a life sentence in California, his admission to this crime opens up the possibility of the death penalty—something he was aware of when he confessed. And Mack's affidavit supports that Jackson committed the murder and there is nothing in the record that indicates she has an ulterior motive for her statement. Additionally, Berry maintained at trial that Jackson was the murderer and there was no physical evidence presented at trial that indicated Berry committed the murder. Therefore, since the Jackson affidavit states specific factual allegations that are not belied by the record and is supported by other evidence, it was an abuse of discretion for the district court to discredit it without conducting an evidentiary hearing.

The district court also incorrectly discounted the Mack and Iden affidavits as naked allegations even though they both contained specific factual assertions. *See Hargrove v. State*, 100 Nev. 498, 502, 686 P.2d 222, 225 (1984) (noting that a petitioner's allegation that certain witnesses could establish his innocence "was not accompanied by the witness[es]' names or descriptions of their intended testimony" and thus was just a bare or naked claim without any specific factual assertions). Mack's affidavit stated that: she was acquainted with Jackson from 1993-1994; she saw him with his brother in Las Vegas soon after the crime; at

that time, Jackson "confessed to me that he, with the help of his brother, committed the murder of Charles Burkes at Carl's Jr. on April 24, 1994"; and "Mr. Jackson said he was the one who shot the victim, Charles Burkes, which killed him." The affidavit of Iden, who originally stated Berry confessed to him while in the holding cell, contains specific factual allegations, such as: the names of the detectives who approached him after he briefly spoke with Berry in the holding cell; that the detectives told Iden information about the murder and encouraged him to state that Berry had confessed to him during the brief conversation in holding; the name of the district attorney who approached him "for the same purpose" and who agreed to recommend a suspended sentence on a pending charge in exchange for the false testimony; that the detectives and district attorney coached him multiple times before he testified; and that he "testified falsely as instructed" at Berry's trial and "Berry never confessed to me." Thus, these affidavits present specific factual allegations of Berry's innocence that are not belied by the record.

To be sure, Iden has changed his story multiple times and is now claiming that everything he said on the stand was a lie. Standing alone, his recantation and allegations of prosecutorial misconduct would be difficult to credit. However, the material part of the affidavit for these proceedings—that his testimony that Berry confessed to him was a complete fabrication—is not without other evidentiary support. Berry testified at trial that he did not confess to Iden and that Jackson, not Berry, committed the crime. Now, Jackson admits to murdering the victim, and Mack claims that Jackson told her he killed the victim, shortly after murdering him. Furthermore, nothing in the record indicates that

Iden currently has a reason to lie. Thus, Iden's affidavit cannot be completely discredited without an evidentiary hearing.

Finally, the district court considered the fact that it took 20 years for the declarants to come forward and exonerate Berry. *See McQuiggin v. Perkins*, 569 U.S. ___, ___, 133 S. Ct. 1924, 1935 (2013) ("Unexplained delay in presenting new evidence bears on the determination whether the petitioner has made the requisite showing."); *Schlup*, 513 U.S. at 300 (stating that the district court "may consider how the submission's timing . . . bear[s] on the probable reliability of that evidence"). The district court was not persuaded by Berry's explanation that Jackson found religion while serving his sentence or that Iden, who was "scheduled to be released from incarceration in another state . . . may want a clean start." However, the district court was not required to be persuaded by the offered explanations. Rather, the district court had to determine how the delay affected the reliability of the evidence or why it prevented Berry from meeting the high standard of an actual innocence claim. For instance, in *McQuiggin*, the state was concerned that a "prisoner might lie in wait and use stale evidence to collaterally attack his conviction . . . when an elderly witness has died and cannot appear at a hearing to rebut new evidence." 133 S. Ct. at 1936. The Court noted that the timing of such a petition "should seriously undermine the credibility of the actual-innocence claim." *Id.* Presumably, this is because waiting provided the petitioner with an advantage. No concerns similar to those at issue in *McQuiggin* have been suggested in this case. Although the declarants' decisions to wait 20 years to exonerate a potentially innocent man in this case is regrettable, to say the least, we fail to see how it undermines the credibility of Berry's actual innocence claim or makes his

evidence of actual innocence so unreliable that he does not deserve discovery and an evidentiary hearing.

## D.

After determining that Berry has presented specific factual allegations of his innocence that are not belied by the record and assuming that the new evidence is credible, we must decide what a reasonable juror would have done if presented with the trial evidence and this new evidence in order to determine whether Berry was entitled to an evidentiary hearing. The trial evidence consisted of multiple eyewitness accounts alleging Berry was the murderer, but no physical evidence, such as fingerprints or DNA evidence, linking Berry to the crime. With these eyewitness accounts, the hypothetical jury hearing the new evidence would have also heard a confession by Jackson, whom Berry testified at trial was the real perpetrator; an uninterested witness's statement that Jackson confessed to her that he committed the murder soon after it occurred; and Iden's testimony that Berry did not confess to him and the prosecution, along with police detectives, who instructed him to testify falsely (or, possibly, Iden's testimony would not have been admitted at all). A jury considering such a record—assuming the truth of the newly presented evidence, as we must at this stage—would likely have reasonable doubt that Berry committed the murder. Jackson's confession, Mack's support for the confession, and Berry's trial testimony that it was Jackson who committed the murder would likely lead to the jury finding that Jackson was the murderer, not Berry. We emphasize again that it is not only the strength of the new evidence that is material. A district court should examine the evidence that led to the original conviction and especially whether the new evidence diminishes the strength of the evidence presented at trial.

Here, the testimony of Jackson and Mack could lead a reasonable jury to seriously question the reliability of the eyewitness accounts. Obviously, Iden's recantation significantly weakens his original claim that Berry confessed to him. Thus, it's clear that the new evidence, if true, supports the allegation that Jackson committed the murder and it casts serious doubt on the central evidence that led to the original conviction. Therefore, we are satisfied that this new evidence, *if true*, shows that it is more likely than not that no reasonable jury would convict Berry beyond a reasonable doubt. As such, the district court abused its discretion by denying Berry an evidentiary hearing, and we remand for an evidentiary hearing on whether Berry is actually innocent, such that the procedural bars no longer apply, and Berry can have his procedurally defaulted claims heard on the merits.

Next, the State argues that even if Berry succeeds on his fundamental miscarriage of justice claim at the evidentiary hearing, he still must show "that the petition is based on grounds of which [Berry] could not have had knowledge by the exercise of reasonable diligence before the circumstances prejudicial to the State occurred," NRS 34.800(1)(a), to overcome the presumption of prejudice to the State. Berry responds that a fundamental miscarriage of justice overcomes all procedural bars, including NRS 34.800(1)(a). The declarations Berry has filed demonstrate that his petition depends in large measure on Jackson's confession. Jackson was interviewed by Berry's investigator in 2005 and refused to cooperate, so presumably his confession was unavailable to Berry before then. It was only in 2013, after Jackson became a Jehovah's Witness, that his confession was forthcoming. The delay in obtaining

SUPREME COURT
OF
NEVADA

(O) 1947A

23

Jackson's confession was due to Jackson, not Berry's failure to exercise reasonable diligence.

Finally, we note that the district court did not address Berry's alternative arguments of good cause and prejudice. *See Pellegrini*, 117 Nev. at 886, 34 P.3d at 537 ("To overcome the procedural bars of NRS 34.726 and NRS 34.810, Pellegrini had the burden of demonstrating good cause for delay in bringing his new claims or for presenting the same claims again and actual prejudice."). The district court's order recognizes only that Berry asserts the actual innocence excuse for his otherwise barred claims. It is unnecessary for the district court to address Berry's alternative arguments because if Berry cannot show a fundamental miscarriage of justice at the evidentiary hearing, then his claim will be barred by laches and a showing of good cause and actual prejudice will be immaterial. Thus, we reverse the judgment of the district court and remand for proceedings consistent with this opinion.

_____, J.
Pickering

We concur:

_____, J.
Saitta

_____, J.
Gibbons